### Deaton v. Commonwealth.

(Decided February 6, 1914.)

### Appeal from Clark Circuit Court.

1. Criminal Law—Selection of Jury from Another County—Action of Circuit Judge in Furnishing List from Another County Not Proper, but Not Reviewable.—The action of the circuit judge in furnishing a list of jurors residing in another county to the sheriff, with instructions to summon them as jurors, was not proper; but this action is not reviewable under Section 281 of the Criminal Code, which denies to this court the right to review the action of the trial court in the formation of the jury.

2. Criminal Law—Section 281 Criminal Code—Not Abridgment of Defendant's Privileges.—Section 281 of the Criminal Code which prohibits this court from reviewing the action of the trial judge in the formation of a jury does not deny the defendant the equal protection of the laws guaranteed by the Fourteenth Amendment of the Federal Constitution, or abridge any of his privileges or immunities as a citizen of the United States.

3.. Criminal Law—"Sweating" Act of 1912—Confessions.—The Act of 1912 denouncing the "sweating" of witnesses and excluding confessions so obtained, has no application to a voluntary con-

fession not made under threats or by other wrongful means; a voluntary confession is competent evidence.

4. Criminal Law—Accomplices—Uncorroborated. Testimony of—Confessions.—The uncorroborated testimony of an accomplice is wholly insufficient to convict the accused of a crime, or of any of its constituent elements, or to render admissible any confessions or admissions of the parties which depend upon and must be preceded by evidence of a conspiracy, unless other evidence besides that of the accomplice is produced tending to prove a conspiracy, and connecting the accused therewith; and evidence merely showing that the offense was committed and the circumstances thereof, is as insufficient for that purpose as it would be to connect the accused with the commission of the offense itself.

5. Criminal Law—Accomplices—Whether one is an Accomplice Must be Ascertained by Evidence.—The fact that one is indicted for an offense does not make him an accomplice within the rule of evidence that requires an accomplice to be corroberated; whether one is an accomplice is a fact which, like any other fact, is to be ascertained from the evidence.

6. Criminal Law—New Trial—Newly Discovered Evidence.—The ruling of the trial judge in refusing to grant a new trial on account of newly discovered evidence which, at most, would only have discredited a witness for the prosecution upon a collateral question, will not be reversed, particularly when there is ample testimony from other witnesses to sustain the verdict.

7. Criminal Law—Appeal—Section 340 Criminal Code.—Under section 340 of the Criminal Code, the Court of Appeals is not authorized to reverse a judgment of conviction for error of law, unless, upon a consideration of the whole case, it is satisfied that the substantial rights of the defendant have been prejudiced thereby.

J. SMITH HAYS, J. SMITH HAYS, Jr., W. A. YOUNG and G. F. WYCOFF for appellant.

JAMES GARNETT, Attorney General, CHARLES H. MORRIS, Assistant Attorney General, and A. F. BYRD for appellee.

OPINION OF THE COURT BY JUDGE MILLER—Affirming.

While in his store on Long's Creek, a tributary of the Middle Fork of the Kentucky River, and about 20 miles from the town of Jackson, in Breathitt County, Ed Callahan was, on May 4, 1912, shot and killed by persons concealed on a wooded hillside in front of his store building, and 156 yards therefrom.

The appellant, D. F. Deaton, commonly called "Fletch" Deaton, and Dan Deaton, James Deaton, Dock Smith, Elisha Smith, Asberry McIntosh, Andrew John-

son, Abe Johnson, Billy Johnson, (Abe's son) Willie Johnson (John's son), Govan Smith, Robert Deaton, (Tom's son), Bill Deaton, John Clear and Tom Deaton (Bill's son), were jointly indicted for the murder. The indictment charged the defendants as principals and as conspirators.

On motion of the Commonwealth the venue was changed from Breathitt County to Clark County, where separate trials were had.

In January, 1913, the appellant, "Fletch" Deaton was tried in the Clark Circuit Court, the trial resulting, however, in a hung jury. At the same term of the court, Andrew Johnson and Dock Smith were tried, and the jury in each case failed to agree. Upon a second trial in August, 1913, the appellant "Fletch" Deaton was found guilty and given a life sentence in the penitentiary. He appeals.

1.    Appellant's first ground for a reversal is, that the jury was improperly selected. After the mistrials of Andrew Johnson, Dock Smith, and the appellant in January, 1913, the circuit judge, being satisfied from the experience of those trials that it would be impracticable, if not impossible, to obtain a jury in Clark County that would be free from bias, ordered the deputy sheriff of Clark County to summon a special venire of ninety legally qualified jurors from the adjoining county of Madison, for the second trial of appellant. This, the circuit court had the right to do. Hargis v. Commonwealth, 135 Ky., 578; Daniel v. Commonwealth, 154 Ky., 605.

It appears, however, that while the presiding judge was holding the May Term 1913 of the Madison Circuit Court he learned from the deputy clerk of that court that the jury list drawn from the jury wheel for grand and petit jury service in Madison County in February, 1913, containing sixty names, and the list of the same number drawn from the wheel for jury service in May, 1913, in that court, had been preserved; and, upon their being produced by the deputy clerk, the whole of the May list and thirty names from the February list, making a total of ninety names, were copied and left with the deputy clerk, who was instructed to deliver said list to the sheriff of Clark County when he should come to

Madison County to summon jurors for the second trial of appellant. When the deputy sheriff went to Madison County pursuant to the order above referred to to summon the extra venireman, he was verbally instructed by the circuit judge to call upon the deputy circuit court clerk of Madison County and get the list of ninety names above referred to, and to summon the persons therein named for service in the trial of appellant. The deputy sheriff followed the judge's instruction, and summoned the ninety men named in the list; and from this number the jury was selected for the trial of appellant. It is insisted that this method of selecting a jury is wholly unknown to the law, was improper, and highly prejudicial to appellant's rights.

There is no statute directing the summoning officer how he shall discharge his duty in selecting jurors from another county. The common law rule is laid down in 24 Cyc., 208, as follows:

"At Common law there was no prior selection of a jury list by persons other than the summoning officer, but the sheriff or other officer selected as he summoned. The practice led to many abuses, and has now to a considerable extent been modified by statute in England, and practically done away with in this country."

The common law method of leaving it to the sheriff to secure the jury has been changed in this State by statute, providing the method of selecting jurors through jury commissioners, leaving it to the sheriff merely to summon those selected by the jury commissioners. As there is no statute, however, covering the case where the sheriff is directed to summon extra talesmen from an adjoining county, the common law method of selecting the jury necessarily becomes operative.

Appellant's motion to quash the panel, and also to discharge the jury before it had been sworn, were overruled, and the trial proceeded before a jury selected from the talesmen summoned from Madison County in the manner above indicated.

It is insisted, however, by the Commonwealth that this action of the circuit judge on motions to discharge the jury or to discharge the panel, are not reviewable by this court.

Section 281 of the Criminal Code of Practice, reads as follows:

"The decisions of the court upon challenges to the panel, and for cause; or upon motions to set aside an indictment, shall not be subject to exception."

Under this section as it now stands, and as it formerly read before it was amended in 1910, this court has held in a long line of decisions, beginning with Adwell v. Commonwealth, 17 B. M., 316, decided in 1856, and ending with Daniel v. Comomnwealth, 154 Ky., 605, decided in 1913, that the decisions of the circuit court upon challenges to the panel and for cause, or upon motion to set aside an indictment, are not subject to exception and are not reviewable by this court.

In Daniel v. Commonwealth, 154 Ky., 606, one of the grounds relied on for a reversal was the act of the circuit judge in summoning a jury from an adjoining county; and in holding that this court had no power to review that action of the trial judge, under section 281 of the Criminal Code as it now stands, this court said:

"But, it is insisted that by the act of the Legislature, approved March 23, 1910 (Acts 1910, Chap. 92), section 281 of the Criminal Code, was so amended as to authorize this court to consider and pass upon the correctness of the court's ruling in impaneling a jury.  Section 281, as amended by the act of 1910, provides: 'The decisions of the court upon challenges to the panel and for cause, or upon motion to set aside an indictment, shall not be subject to exception.'  Prior to the adoption of this amendment, this court was without authority to pass upon the correctness of the court's ruling upon a motion for a new trial.  By this amendment, the words 'and upon motions for a new trial' were stricken from section 281, thereby giving to this court power to review the action of the trial court in passing upon a motion for a new trial.  There remained, however, the inhibition against the right of this court to review the action of the trial court in the formation of the jury."

This authority is conclusive of the question before us: and while the action of the trial judge in selecting the jurymen himself instead of leaving it to the sheriff, was not proper, it is not reviewable.

While in some cases the court has, perhaps, expressed an opinion upon questions not really reviewable, it was not done, however, for the purpose of reversing the ruling of the circuit court on those questions confided solely to that tribunal, but in order that there might, thereafter be a uniform administration of the criminal law by the several circuit courts.

We are glad to note, however, that there is no complaint that the jury which tried appellant was not a lawful jury, or that any man that sat thereon was not qualified to sit in the case, under the strictest interpretation of the statute; and we are satisfied from a consideration of the record that appellant has not, in fact, been prejudiced in the selection of the jury which tried him.

2. Next, it is contended that in overruling appellant's motion to quash the panel the circuit court denied appellant the equal protection of the laws guaranteed him by the 14th Amendment to the Federal Constitution, in that he has been tried and convicted by a jury selected arbitrarily; and that if it be claimed by the Commonwealth that section 281 of the Criminal Code of Practice, *supra*, was intended to bind appellant, then that section is in violation of that other clause of the 14th Amendment, which provides that no State shall make or enforce any law which shall abridge the privileges or immunities of the citizens of the United States. We fail to see the force of the argument, as applicable to this case. Appellant has not been deprived of his right of trial by jury. The manner of selecting the jury in state prosecutions is left entirely with the states. Moreover, the jury in this case was selected after the manner of the common law, and if the state is willing to leave the determination of that question with its circuit court, it may do so without any infringement of the 14th Amendment.

Section 281 prescribes a general rule of practice applicable to all persons; it satisfies the constitutional maxim of furnishing a common rule for rich and poor, for the favorite at court, and the countryman at plow. It did not take from appellant any right which is guaranteed to any other person similarly situated, either by its terms or by its administration. Furthermore, the right to review by appeal the decisions of a trial court is not a fundamental right which a defendant in a crimi-

nal case can always claim; on the contrary, it is a matter of grace, to be granted by the state in its discretion.

Prior to 1841, this court had no jurisdiction to reverse the decisions of circuit courts in prosecutions for misdemeanors except in cases where a fine was the only punishment, and then only upon the appeal of the defendant. Commonwealth v. Jefferson, 6 B. M., 313. And it was not until 1854 that an appeal was allowed in felony cases. Commonwealth v. Craig, 15 B. M., 537. Section 181 of the Criminal Code deprived appellant of none of his common law or constitutional rights.

3. It is claimed that appellant was convicted upon the testimony of his co-conspirators, Dock Smith, Dan Deaton, Abe Johnson, Billy Johnson, and others, who were jointly indicted with appellant for the murder of Callahan; and that their testimony was procured by what is known as the "sweating" process, denounced by the Act of 1912. After the trials in January, 1913, some of the witnesses above-named made full confessions of the circumstances leading up to the killing of Callahan, and the manner in which he was killed, Dock Smith admitting that he, Andrew Johnson, and James Deaton shot Callahan pursuant to a preconcerted plan outlined by the appellant "Fletch" Deaton.

It is insisted that these confessions should not have been admitted in evidence, because they were obtained by "sweating" the witnesses while they were in jail.

After defining sweating to be the questioning of a person in custody charged with crime in an attempt to obtain information from him concerning his connection with or knowledge thereof after he has been arrested and is in custody, by plying him with questions, or by threats or other wrongful means, and extorting from him information to be used against him as testimony upon his trial for such alleged crime, section 3 of the Act if 1912 provides that no confession obtained by means of sweating shall be permitted as evidence in any court of law in this state, but shall be deemed to have been obtained by duress, if it be shown that such confession was made after the arrest of the party charged with the crime, and while he was in the custody of the law. Acts 1912, page 542

There is no evidence, however, even tending to show that the "sweating" process was applied to any of these

witnesses; on the contrary, no one of them swears that he was plied with questions, or threatened in any way, but all say they freely and voluntarily went to the Commonwealth's Attorney and made their confessions after they had come to the conclusion that their defense had broken down, and that they were beaten.

In sustaining this Act, in Commonwealth v. McClanahan, 153 Ky., 417, we said:

"We do not mean to hold that a voluntary confession may not be made by one charged with crime and under arrest, for such confessions have often been admitted and will yet be admitted by the courts as competent; but it should come from the defendant under such circumstances as show it to be made of his free will, and with full and perfect knowledge of its nature and consequences, free from dictation or coercion of others."

Passing the contention of the Commonwealth that the confessions were not made by appellant, and did not, for that reason, come within the scope of the statute, it is clear the confessions objected to in this case were voluntary and made under circumstances which show they were made by the parties of their own free will, and with a full knowledge of their nature and consequences; and, that being true, they were competent. The court did not err in admitting them.

4. It is earnestly contended that the evidence fails to show a conspiracy on the part of the appellant; that no witness testifies to any overt act on his part, and that the verdict is, therefore, not sustained by the evidence.

The story is a long one; but the gravity of the offense and the importance of the verdict to the appellant requires a review of the facts, as briefly as is consistent with the importance of the case.

There are about seven principal places that figure in this tragedy; and in order that the evidence may be fully comprehended, and given its true effect, a map showing the Middle Fork and the North Fork of the Kentucky River, and the relative locations of the principal places above referred to, is here inserted for reference:

The home of Ed. Callahan on Long's Creek, about one mile fom the Middle Fork; Abe Johnson's residence on the Middle Fork, about three or four miles above the mouth of Long's Creek; the town of Buckhorn on the Middle Fork, about two miles above Abe Johnson's home; the home of John E. Deaton, at the mouth of Caney on the North Fork; James Deaton's home on Caney Creek, about two miles above its mouth; and the town of Jackson, the county seat of Breathitt County, located further down the North Fork, are the principal places above referred to.

Appellant resides in Jackson; Callahan conducted a country store next to his residence on Long's Creek.

About three years before the killing of Callahan, he had been shot and dangerously wounded while standing in the front door of his store, by unknown persons concealed on the same hillside on the opposite side of the creek from which he was finally shot and killed, in May, 1912.

After the first attempt upon his life, Callahan built a high board fence or palisade extending from his residence to the rear end of his store so that he could pass from one to the other without being seen from the mountain from which he had been shot. The last shooting of Callahan occurred on Saturday, May 4th, 1912, about the middle of the forenoon. On the Sunday before, he went from his home in a gasoline boat in company with Clifton Gross, his son-in-law, to Athol, a railroad station on the Middle Fork; and thence on the following Monday morning he went to Jackson, which is the home of the appellant "Fletch" Deaton. It is also the home of his co-defendants, Govan Smith and "Red Tom" Davidson. Callahan was seen on the streets of Jackson on that day by several people. He left Jackson on the train at 2:20 p. m. for Louisville, to buy a spring stock of goods for his store. His presence in Jackson, his departure for Louisville, and the purpose of his visit, were well known in Jackson. Several of the defendants who lived on the Middle Fork and in Callahan's neighborhood, had gone down the Middle Fork on rafts of timber, and on their return by way of Jackson they saw Callahan at the railroad station at the Beattyville junction on his way towards Louisville. It was Callahan's habit to ship his goods to Elkatawa, on the Lexington & Eastern Railroad, where he would put his goods on freight boats and take

them up the Middle Fork to the mouth of Long's Creek, and thence on wagons to his home. He usually accompanied these boats in person.

James Deaton, who lived on Caney Creek, is the son of appellant; Bob Deaton, who lived near the mouth of Caney, is the nephew of appellant; and Abe Johnson, who lived on the Middle Fork about four miles from Callahan's store, is also a nephew of appellant. Dan Deaton, who lived on the Middle Fork about one-half mile from Abe Johnson's, is the great nephew of appellant; and Billy Deaton, another great nephew, lived with appellant and worked for him at his home in Jackson. Tom ("Trigger Eye") Deaton, another nephew of appellant, lived on the Middle Fork about one-half mile from Abe Johnson's. Andrew Johnson and Willie Johnson are brothers and great-nephews of appellant. Govan Smith lived in Jackson, while Dock Smith lived with his father-in-law in Russell County, near the Middle Fork. Their brother, Elisha Smith, and Asberry McIntosh, lived near Buckhorn; while John Clear had been working for appellant for sometime previous to the killing of Callahan. It will be remembered that many of the above named persons were jointly indicted with appellant, "Fletch" Deaton, for the murder of Callahan.

The appellant, "Fletch" Deaton, is about fifty years old. Several years ago his brother, James Deaton, had been killed at the mouth of Long's Creek in a fight, and Ed. Callahan and several other persons were jointly indicted for the killing. Naturally, appellant aided in the prosecution of Callahan, who was, however, acquitted. And although Callahan and appellant had subsequently had a few business transactions, they were not on very friendly terms.

Furthermore, shortly before the killing of Ed. Callahan in May, 1912, John Davidson, a nephew of appellant and a brother of "Red Tom" Davidson, and Levi Johnson were killed at Buckhorn, in Perry County. Four persons were jointly indicted in the Perry Circuit Court for the murder, and their trials were held in June, 1912. (151 Ky., 87). In that trial appellant, "Fletch" Deaton and a number of others jointly indicted with him in this case, were actively engaged in the prosecution of the men charged with the killing of Davidson and Johnson, by employing counsel and furnishing money to aid the prosecution. There is evidence tending to show that appellant

and some of those jointly indicted with him, accused Callahan of being instrumental, in a measure, in the killing of Davidson and Johnson, and of helping defend the parties charged with their murder. It further appears that appellant more than once said it would be impossible to secure a conviction of the murderers of Johnson and Davidson in the Perry County cases, so long as Ed. Callahan was alive, and that he must be killed before those cases came to trial.

Furthermore, it is shown that Jase Deaton, appellant's nephew, and "Red Tom" Davidson, who also were accused of killing Callahan, were tried in the Bourbon Circuit Court on the charge of killing John Abner in the town of Jackson several years ago, and that Callahan was at Paris employing counsel and aiding in the prosecution of those persons.

Again, it further appears that Jase Deaton above referred to, had been killed at the home of Anse White, by Anse White, sometime before Ed. Callahan was killed, and that Anse White had been tried in the Montgomery Circuit Court for this crime and had been acquitted; and that Callahan was present at that trial aiding in the defense of Anse White.

The proof in the trials of appellant and the proof in the trial of Andrew Johnson show that Callahan was killed by three men who had concealed themselves on the mountain-side across the creek from Callahan's store. Hurd McIntosh says he was standing near Callahan's store, at the time of the shooting, and that he recognized Dock Smith and Andrew Johnson, whom he knew, as being two of the men; the third man he did not recognize. Dock Smith testified that the third man was James Deaton, of Caney Creek, who is the son of appellant.

In all the trials in the Clark Circuit Court in connection with the killing of Callahan, except perhaps the trial of "Red Tom" Davidson, the defendants undertook to prove an *alibi* for Dock Smith, Andrew Johnson and James Deaton, by showing that they were in Jackson on Saturday when Calahan was shot, and that the apellant, "Fletch" Deaton was also at his home in Jackson at the time of the killing.

Upon the first two trials at Winchester, many witnesses besides the defendants themselves testified that they saw Dock Smith and Andrew Johnson in Jackson

on Saturday at the time Callahan was shot. This defense had not been relied upon on the trial for bail which had theretofore been held in Winchester in October; it was first relied upon at the regular trials held in December and January following. As a consequence, many of the *alibi* witnesses were indicted for false swearing; whereupon several of them confessed their guilt, saying they had been induced to give this testimony by some of the defendants and others interested in their defense.

Dock Smith and Govan Smith realizing the true situation, and believing there was no escape from conviction, made a full and voluntary confession of all they knew of the murder of Callahan.

Without detailing the names of the witnesses, we will outline their story of the acts of the several defendants during the three days immediately before the shooting of Callahan.

As heretofore stated, Callahan was shot on Saturday forenoon. On the preceding Wednesday, about two o'clock p. m., Dock Smith met Andrew Johnson on the Middle Fork just below the mouth of Gay's Creek. Johnson told Dock Smith that James Deaton wanted Dock and Andrew Johnson to help kill Callahan, and for Dock to go to Deaton's house that night. Smith says he was talking with John Begley at the time he met Johnson; that Johnson asked him if he had a gun, and he told Johnson that his gun was at his father's; that Johnson then told him he would go back home to Granville Johnson's, and would meet Smith there that night; that Smith went to his father's, got his gun, ate his supper, and then went to the mouth of Orville's Branch between Granville Johnson's and Abe Johnson's on the Middle Fork, and there met Andrew Johnson, Willie Johnson, Tom Deaton and Billie Johnson. From that point Smith and Andrew Johnson proceeded to the home of James Deaton, on Caney Creek, which they reached late at night, finding James Deaton and Dan Deaton there. That night the four discussed the proposed killing of Ed. Calahan, James Deaton telling them that on the next morning he would go to Jackson and see his father, the appellant, "Fletch" Deaton, and learn from him what definite plans had been made about the killing of Callahan, and would get "Red Tom" Davidson's Savage rifle. The next morning (Thursday) James Deaton and Dan Deaton left James Deaton's house and went down Caney Crek to-

wards John E. Deaton's, at the mouth of Caney, Dock Smith and Andrew Johnson remaining at James Deaton's house.

Late on Thursday evening James Deaton came home from Jackson riding "Red Tom" Davidson's mule, and brought with him a gun which he said belonged to "Red Tom." After supper Smith, Johnson and James Deaton left James Deaton's residence, Dock Smith riding the mule and carrying the gun, and James Deaton and Andrew Johnson walking. They proceeded to the home of John E. Deaton at the mouth of Caney Creek, where they met Bob Deaton, another defendant herein. They told Bob where they were going, and their purpose, and Bob joined them in their expedition. They left the mule at John E. Deaton's; and Dock Smith, James Deaton, Andrew Johnson and Bob Deaton went from there to Abe Johnson's on the Middle Fork, about three miles above the mouth of Long's Creek, arriving there some time after midnight Friday morning.

They spent Friday at and around Abe Johnson's. About noon they sent for Dan Deaton, whom they had left at the home of James Deaton on Thursday morning. Dan responded, and all of them, including Abe Johnson, Billy Johnson, his son, Willie Johnson, a brother of Andrew Johnson, discussed plans for the killing of Callahan. James Deaton told Abe Johnson and Billy Johnson that his father, "Fletch" Deaton wanted them to come to Jackson on the train Saturday morning so they could be there as witnesses to prove the *alibi,* and that Willie Johnson was to come with them: It was arranged that Dock Smith, Andrew Johnson, Bob Deaton and Dan Deaton were to go down to the Grand Sire Rock on the Middle Fork, below the mouth of Long's Creek to watch for Callahan and Anse White, who were expected to come up on Callahan's boats on that day. This arrangement was carried out.

Before starting, however, they procured two quarts of whiskey, and drank about half of it before they left Abe Johnson's, about two o'clock Saturday morning. Abe Johnson, Billie Johnson and Willie Johnson went to Jackson; and the other five men, Dock Smith, Andrew Johnson, James Deaton, Dan Deaton and Bob Deaton went toward Long's Creek. All had guns. Before leaving Abe Johnson's they procured a bucket of provisions,

and went by the home of Granville Johnson where they procured another bucket of provisions. There they boarded Granville Johnson's boat and started down the river; but the boat began to leak, and being too small to carry then all, they procured another boat which belonged to Granville Riley and was chained to the bank. To unfasten Riley's boat 'they broke the chain by which it was fastened, by taking out a wire link, leaving a piece of chain about three feet long hanging to the boat.

In this way they proceeded to the mouth of Long's Creek, where they left the boats. From there they went to the home of Willie Deaton, a son of James Deaton, to inquire whether Callahan had returned home, and were told that Callahan had left the boats and gone home on the evening before. After borrowing a gun from Willie Deaton, Dan Deaton and Bob Deaton went to the Grand Sire Rock for the purpose of watching for the Callahan boats, and to kill Anse White. In the meantime, Dock Smith, Andrew Johnson and James Deaton went to the hillside across the creek from Callahan's store, arriving there shortly before daylight Saturday morning.

They placed themselves at a point where they could see the front of Callahan's store. Two of them prepared forks about eighteen inches long, which they drove in the ground to use as rests in shooting; the other one piling up some rocks upon which to rest his gun. They watched for Callahan until between nine and ten o'clock without seeing him.

The front of Callahan's store contained a glass window, and they could see the outline or form of a man passing behind the window on the inside of the store. Concluding that the shadow thus cast must be that of Callahan, they fired six shots through the window, three of them taking effect and mortally wounding Callahan. The men became panic-stricken and left their place of concealment hurriedly, going through the back woods to the home of Abe Johnson, where they got their dinner. After dinner "Trigger Eye" Deaton carried them across the Middle Fork, and they went from there to the head of Bush's Branch, and down Bush's Branch to the river, and across to the home of John E. Deaton at the mouth of Caney, where they arrived shortly after dark. They were told by John E. Deaton that Bob and Dan Deaton, who had gone to the Grand Sire Rock the day before, had

just left John E. Deaton's on their way to Jackson, riding "Red Tom" Davidson's mule.

Dock Smith, Andrew Johnson and James Deaton procured John E. Deaton's boat and floated down the river to Russell's residence, where they left the river, went by a circuitous route over the hills and down Stray Branch and the river to Jackson, reaching the house of appellant, "Fletch" Deaton, shortly before daylight on Sunday morning. There they found "Fletch Deaton, "Red Tom" Davidson, Abe Johnson, Billie Johnson, and others waiting for them. "Fletch" Deaton, "Red Tom" Davidson and Abe Johnson were dressed. About thirty minutes after their arrival Bob Deaton and Dan Deaton came in riding "Red Tom" Davidson's mule. They were wet and muddy, and gave as a reason therefor that the mule had fallen down with them. They all discussed the shooting of Callahan. Dock Smith said the bucket of provisions they got at Granville Johnson's had been taken by him and James Deaton and Andrew Johnson to a point on the mountain near where they were concealed when they shot Callahan; that they had hung the bucket on a tree before the shooting; and that in their excitement after the shooting, they had run away leaving the bucket hanging there.

Such is the outline of the story as told principally by Dock Smith, Govan Smith, Abe Johnson, Billy Johnson and Dan Deaton.

Andrew Johnson and James Deaton, the other two men charged with the killing of Callahan, deny every material fact related by Dock Smith which tends to connect them with the shooting of Callahan. They insist they were in Jackson when Callahan was killed—more than twenty miles over a mountainous country from the scene of the tragedy. And while it is true many of the witnesses, upon either side, were impeached, it was the province of the jury to pass upon their credibility, and the weight to be given to their testimony.

It is insisted that this case comes within the principle of the decision in Crews v. Comonwealth, 155 Ky., 129, where we said the conspiracy charged in that case had not been shown, there being an absence of motive upon the part of defendant, and no act of defendant's having been shown to connect her with the murder. On the contrary, the relations between the parties in that case were happy. In the case at bar, however, there is not only

direct and positive evidence connecting appellant with the conspiracy to kill Callahan, but ample motive upon his part has been shown. It is not for this court to say that the jury should not have believed the witnesses.

But it is said that Dock Smith, Govan Smith, Abe Johnson, Dan Deaton and Billy Johnson were confessed accomplices in the killing of Callahan and that a conviction cannot be had upon their testimony alone.

Sections 241 and 242 of the Criminal Code prescribe the rule in such cases as follows:

"241. A conviction can not be had upon the testimony of an accomplice, unless corroborated by other evidence tending to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely show that the offense was committed, and the circumstances thereof."

"242. In all cases where, by law, two witnesses, or one witness with corroborating circumstances, are requisite, to warrant a conviction, if the requisition be not fulfilled, the court shall instruct the jury to render a verdict of acquittal, by which instruction they are bound."

The trial court properly gave the law upon this subject; there is no claim to the contrary.

In applying section 241, *supra,* to a case of conspiracy in Bowling v. Commonwealth, 79 Ky., 606, we said:

"The uncorroborated testimony of an accomplice is wholly insufficient to convict the accused of a crime, or of any of its constituent elements, or to render admissible any confessions or admissions of the parties which depend upon and must be preceded by evidence of a conspiracy unless other evidence besides that of the accomplice is produced tending to prove a conspiracy, and connect the accused therewith, and evidence merely showing that the offense was committed and the circumstances thereof is as insufficient for that purpose as it would be to connect the accused with the commission of the offense itself."

And whether a witness is an accomplice, is a question to be determined from the evidence.

In Smith v. Commonwealth, 148 Ky., 69, we said:

"But, say the appellants, these women are accomplices; and their testimony has not sufficient corroboration to uphold the conviction. Sections 241-2, Criminal Code. They are corroborated in every single circumstance, practically, save in that they are the only wit-

nesses introduced by the Commonwealth who actually saw the deadly blows struck. It is erroneously asumed by appellants that they were accomplices. The fact that they were so indicted does not make them so. Ochsner v. Commonwealth, 128 Ky., 761; Sizemore v. Commonwealth, 6 S. W., 123; Nelms v. Commonwealth, 82 S. W., 260. That fact, like any other fact, is one to be ascertained from the evidence. 'Whether the witness is in truth an accomplice is left to the jury to determine, and if they conclude him to be such, then and then only are they to apply the rule requiring corroboration.' Wigmore's Evidence, section 2060. In the case at bar, the question of accomplice *vel non* was aptly left to the jury; and as our method of criminal procedure submits only the general issue to the jury, and does not admit of answer by them to any intermediary questions in the record, it is fairly to be assumed that, had the jury any reasonable doubt about the corroboration, they nevertheless rightly found their verdict of guilty, after going through the mental ascertainment that, under the instructions, the women were not accomplices, and that corroboration was not necessary.''

Bearing these rules in mind, we will examine the testimony of the principal witnesses, but not all of them, upon that subject to see if the requirements of section 241, *supra,* have been satisfied.

Dan Deaton testified that he, on the Monday before Callahan was killed, with Biliie Johnson, Abe Johnson, Elisha Smith, Dock Gross, and others from the Middle Fork, had gone down that stream on rafts of timber, and that they returned to Jackson on Monday by way of Beattyville Junction on the L. & E. Railroad; that at the Beattyville Junction they saw Callahan on the train going toward Lexington; that they went to Jackson on Monday night, where they remained all night; that on Tuesday morning the appellant, "Fletch" Deaton, met "Red Tom" Davidson, James Deaton, Billie Johnson, and Dan Deaton in a room at "Fletch" Deaton's house, and the others told Dan Deaton that they had arranged to kill Callahan, and wanted Dan Deaton and Billie Johnson to help them do it. They explained to the two latter that Callahan had gone to Louisville to buy goods, which he would convey up the Middle Fork on boats, and that they could go to Turkey Creek and kill him as he came back. Dan Deaton, James Deaton, Tom Deaton, Billie John-

son, Elisha Smith, and several others left Jackson about noon on Tuesday and went up on the L. & E. train to Arthur Cary Station, which was at that time the terminus, for passenger traffic, on the road. After leaving the train, all of them went up the river to the home of John E. Deaton, at the mouth of Caney, and from there Dan Deaton and James Deaton went to the home of James Deaton on Caney Creek and stayed there Tuesday night, Wednesday, and Wednesday night, leaving there on Thursday morning, in company with James Deaton. They proceeded to the Mouth of Caney, and thence on to Dan Deaton's home near Abe Johnson's on the Middle Fork, James Deaton leaving him and saying he was going to Jackson. Dan Deaton says that Dock Smith and Andrew Johnson came to the home of James Deaton on Wednesday night; that they left there on Thursday morning; and he saw no more of them until about Friday noon, when he saw them at Abe Johnson's. Abe had sent for Dan to come to his house, and when he got there he found Dock Smith, Andrew Johnson, Abe Johnson, Billie Johnson and Bob Deaton. From that point he corroborates the statements of Dock Smith as to what occurred at Abe Johnson's, and as to their travels to the mouth of Long's Creek.

He further says that when he and Bob parted from the others at the mouth of Long's Creek, he and Bob went to the Grand Sire Rock to watch for Callahan's boats, and Anse White; that the boat passed up the river about noon, but that neither Callahan nor White was on the boat; and that they heard persons on the boat talking about Callahan having been shot. They immediately left the Grand Sire Rock and started for Jackson, passing by the home of John E. Deaton at the mouth of Caney, which they reached shortly after dark. After supper they procured "Red Tom" Davidson's mule, and both rode it to Jackson, arriving there early Sunday morning, as above stated. In going to Jackson they went up Caney Creek, and over to and down Troublesome Creek to the Kentucky River, and thence down the river to Jackson. ,

Dan Deaton further says that when they reached Jackson they went to the home of appellant, "Fletch" Deaton, and found him, and Dock Smith, Andrew Johnson, James Deaton, "Red Tom" Davidson and Abe Johnson there waiting for them; and that on their way

the mule they were riding had fallen with them, throwing them into the muddy road. He also tells about "Fletch" Deaton and James Deaton directing the mule's shoes to be taken off, so it could not be identified by its tracks.

Billy Johnson, another defendant, also testified and corroborated Dan Deaton as to the conversation with "Fletch" Deaton, "Red Tom" Davidson and James Deaton. Billy Johnson further said that on the Tuesday morning on which this conversation occurred at the home of "Fletch" Deaton, he, in company with James Deaton and others went to Quick Sand, a small town above Jackson on the Kentucky River, and on that trip James Deaton told him of the plan to kill Callahan, and asked him to help them do it. Billy Johnson corroborates Dan Deaton and Dock Smith as to Smith, James Deaton and Andrew Johnson going to Abe Johnson's house on Friday morning before daylight and remaining there until Saturday morning after midnight; and that his father, Abe Johnson and Willie Johnson left Abe Johnson's and went to Arthur Cary and from that place went by train to Jackson, ariving there about eleven o'clock Saturday. He also corroborates the statements of Dan Deaton and Dock Smith that they arrived at "Fletch" Deaton's on Sunday morning just before daylight. He further says that Dock Smith, Andrew Johnson and James Deaton told him in the presence of "Fletch" Deaton about the killing of Callahan, and the way in which it had been done; the route they had traveled in getting from Callahan's to Jackson; that Bob Deaton and Dan Deaton told of their going to the Grand Sire Rock for the purpose of killing Anse White; the route by which they came to Jackson; that their clothes were muddy, and had said to him in the presence of "Fletch" Deaton that the mule had fallen down with them, throwing them into the muddy road.

Furthermore, Billy Johnson testified that "Fletch" Deaton and James Deaton directed the shoes to be pulled off the mule they were riding so that it could not be identified by the tracks.

Abe Johnson corroborates Dock Smith, Dan Deaton and Billy Johnson about what occurred at his house on the Friday night, and Saturday morning, before Callahan was killed. He further says that he and his son, Billy Johnson, and his nephew, Willie Johnson, went to Jackson at the request of "Fletch" Deaton and James

Deaton for the purpose of being at Jackson as *alibi* witnesses in the event Callahan was killed. He says it was arranged that they were to tell that the business they came on was to buy a mill from "Fletch" Deaton, and that after they arrived at Jackson they all purposely talked about the mill trade in the presence of another person so they could prove the fact of the mill trade.

Abe Johnson further testifies that neither Dock Smith, Andrew Johnson, James Deaton, Bob Deaton nor Dan Deaton was in Jackson on Saturday or Saturday night, and that they came to "Fletch" Deaton's on Sunday morning before daylight.

Govan Smith says that neither Dock Smith, Andrew Johnson nor James Deaton was in Jackson on Friday the day before Callahan was killed; that he first saw them on the street on Sunday morning the day after the killing, and that their shoes and pants were muddy; that he told them if they did not get off the street and have the mud taken from their clothing, they would be accused of killing Callahan; and that they went into his house and had their shoes blacked and the mud cleaned from their clothes.

Govan Smith also says that the plan of proving that Andrew Johnson and Dock Smith were in Jackson the Saturday morning of the day that Callahan was killed, was not discussed until the first trial of "Fletch" Deaton at Winchester.

Abe Johnson's wife, who is not a defendant and clearly not an accomplice, corroborates her husband, and Billy Johnson, Dan Deaton and Dock Smith, in stating that after the killing of Callahan on Saturday, Dock Smith, Andrew Johnson and James Deaton came to her house and got their dinners; that her brother, "Trigger Eye" Deaton set them across the Middle Fork; that as they were being set across the river, her fourteen-year-old son, Tommie Johnson, came home from Buckhorn and told her of the shooting of Callahan; and that immediately upon receiving this information she went from her home to the Middle Fork, a few hundred yards distant, and told the parties who were crossing the river about hearing of the shooting of Callahan, and that they had better get away.

The boy, Tommie Johnson, who is neither a defendant nor an accomplice, also testified that Dock Smith, Andrew Johnson and the others came to his father's

house on Friday morning before daylight, and remained there until Saturday morning.

As before stated, Hurd McIntosh was near Callahan's store at the time he was shot, and recognized Dock Smith and Andrew Johnson as two of the men who did the shooting, thus corroborating Dock Smith upon this point.

William Amis corroborates the accomplices by testifying that he saw Granville Riley's boat upon the bank at Long's Creek where the accomplices say they left it; and he describes the broken chain that was attached to the boat in the same way it had been described by the accomplices. He also saw tracks leading from the boat up the river bank in the direction of Willie Deaton's.

Berry Turner corroborated Dock Smith, by testifying that after Dock Smith related the circumstances of the killing, Turner went to the place on the mountain side where the accomplices had concealed themselves, and found a rusty bucket, the same as described by Dock Smith, hanging on a tree, and that it contained decayed provisions.

Robert Neally, who lives on Caney Creek near James Deaton, corroborated the accomplices, by testifying that for sometime prior to the killing of Callahan, Dock Smith, Andrew Johnson and others had been assembling at the home of James Deaton, about fifty yards distant, and engaging in target practice, with long range guns and rifles; and that on Thursday evening before Callahan was killed he saw James Deaton ride to his home on Caney Creek on a mule, and carrying a gun; that shortly thereafter he saw James Deaton and two other men that he took to be Dock Smith and Andrew Johnson, leave the home of James Deaton and go down Caney Creek; that one of them was riding the same mule that James Deaton had ridden, and was carrying the same gun that James Deaton had brought with him; that just as these persons were passing his house, James Deaton's wife came toward him crying and leading her two children, and calling to James Deaton to come back, saying "the men who are getting you into this trouble would not pull me or your children out of the fire;" that James Deaton cursed her, and told her to go back into the house, and that Deaton's wife and children stayed at Neally's house during the following week while James Deaton was absent from home. A week later Neally says he received a message from James Deaton to meet him at John E.

Deaton's at the mouth of Caney; that he met James Deaton there, with some other men, whom he did not know, in an upstairs room, and that James Deaton told him he was afraid to go home; that he was afraid Callahan's friends would kill him. When James Deaton finally returned to his home, Neally stayed with him several nights.

Mrs. Robert Neally corroborates her husband in many respects.

Catherine Stidham, a niece of "Fletch" Deaton's wife, lived in "Fletch" Deaton's family. She says she waited on the table Friday night, Saturday night and Sunday, and that neither Dock Smith, Andrew Johnson, James Deaton, Bob Deaton nor Dan Deaton took their meals at "Fletch" Deaton's on any of those days until Sunday morning, thus corrobarating the other witnesses who say these men did not reach "Fletch" Deaton's in Jackson, until Sunday morning about daylight. She further says that on Sunday morning "Fletch" Deaton, before bringing these parties down to breakfast, went to the front door of the house and locked it, and pulled down the window shades, and then took them into the kitchen to wash, a thing he had never been known to do before; and that after they had washed, he took them to their breakfast. On Sunday, she found in a room where some of the defendants had stayed the night before, a pile of wet, muddy clothing; and she further testifies that Dan Deaton and Bob Deaton were wearing clothing which she recognized as belonging to "Fletch" Deaton.

Sam Moore, a lumberman, who was boarding at "Fletch" Deaton's, and who had been there from Thursday evening until the Sunday after the killing of Callahan, corroborates Catherine Stidham and others, to the effect that none of the accomplices took their meals at "Fletch" Deaton's either on Friday or Saturday, and that he first saw the accomplices on Sunday morning after the killing.

Louis Smith corroborates his son, Dock Smith, by saying that on Wednesday evening before Callahan was killed Dock came to his house late in the evening and ate his supper there, and when he left he carried his Winchester rifle; and that he did not see Dock again until after Callahan was killed.

John M. Begley says he saw Dock Smith pass his house below the mouth of Gay's Creek on the Wednes-

day before Callahan was killed; and while he was talking with Dock he saw Andrew Johnson pass up the river on the opposite side, and that Johnson and Smith went up the river together in the direction of Gay's Creek.

"Trigger Eye" Deaton corroborates the accomplices, by telling of the trip with Dan Deaton, Billy Johnson and others to Arthur Cary Station on Tuesday; that they got off the train and went up the river to the mouth of Caney, where he left his son, Dan Deaton; that on Tuesday evening he went to his house on the Middle Fork, near the home of Abe Johnson; that he saw no more of his son Dan until Friday; that Dan worked at his house all day Friday until late in the evening, and that he saw no more of Dan from that Friday evening until sometime after Callahan was killed.

Russell Wooten says he was at "Fletch" Deaton's late in April, shortly before Callahan was killed; that he was in "Fletch" Deaton's room, which was also occupied by other persons; that "Fletch" Deaton asked the others to leave the room, and after they had gone and he and Deaton were alone, Deaton asked him to help him kill Ed. Callahan.

Mrs. Lillie Johnson, the widow of Levi Johnson who was killed at Buckhorn, a daughter of Elisha Smith, and a niece of Dock Smith, saw Andrew Johnson and Dock Smith at Govan Smith's, in Jackson, on the Sunday after Callahan was killed. She says their clothing was wet and muddy, and that she cleaned Dock's clothing.

She also says that on the Sunday before Callahan was killed, she rode horse-back, behind "Fletch" Deaton from Granville Johnson's, in Perry County, near Buckhorn, to Jackson, in a party which included "Red Tom" Davidson and others, who were also riding horseback; and that on this journey she heard "Fletch" and "Red Tom" Davidson say "it would soon be green enough to have Ed. Callahan killed."

There are other instances of corroboration; but as this opinion has already grown to an unreasonable length, they will be passed unnoticed. We deem it sufficient to say that the corroborating testimony was sufficient both in quantity and in character to fully satisfy the rule of corroboration prescribed by the Criminal Code, above quoted.

5. Price Terry testified that on Monday before Callahan was killed, and while the witness was in Govan Smith's store in Jackson, he overheard several persons in a back room talking about money, and on going into the room he saw Govan Smith, "Fletch" Deaton, Bob Deaton, James Deaton and "Red Tom" Davidson, there.

Subsequently, upon the trial of James Deaton, Terry repeated the story saying he knew James Deaton well; but being called upon to identify James Deaton he first pointed out Proctor and afterwards Wycoff, as being James Deaton. This incident was made the ground for a new trial in this case, upon the ground of newly discovered evidence.

The substance of this ground for a new trial is that in the trial of "Fletch" Deaton, Terry falsely swore he knew James Deaton. At most, the newly discovered evidence could only have discredited Terry; and since his testimony was of minor importance and there was an abundance of other testimony to sustain the verdict, the court properly overruled the motion for a new trial. Under section 340 of the Criminal Code this court is authorized to reverse a judgment of conviction for an error of law only when, upon a consideration of the whole case, it is satisfied the substantial rights of the defendant have been prejudiced thereby; and as a careful consideration of the entire record in this case fails to show any error to the substantial rights of appellant, the judgment will have to be affirmed.

It is so ordered.