## Childers v. Commonwealth.

(Decided December 8, 1914.)

Appeal from Knox Circuit Court.

1. Criminal Law—Jury—Manner of Selection Not Subject to Exception.—Under Section 281 of the Criminal Code the action of

the trial court in ordering a jury to be summoned is not subject to exception, and so when the court ordered the sheriff to go to a certain part of the county and select jurors, his action was not subject to review by this court.

2. Criminal Law—Evidence—Motive—Ill-will.—It is a uniform rule in criminal practice in homicide cases to permit the Commonwealth to give evidence of any pertinent facts or circumstances tending to show ill-will or bad feeling on the part of the accused toward the deceased, or a motive that may have contributed to influence the commission of the act.

3. Criminal Law—Evidence—Remoteness.—The question of the remoteness of evidence introduced for the purpose of showing threats, or other relevant acts tending to establish motive, goes rather to the weight than to the competency of this character of evidence.

4. Criminal Law—Evidence—Admonition of Court to Jury Respecting.—Where evidence of other offenses is competent, it is the duty of the court to admonish the jury, at the time of its introduction, of the purpose for which it is admitted; but when the evidence merely goes to show the state of feeling on the part of the accused towards the deceased, it is not required that the trial judge should give any admonition to the jury.

5 Criminal Law—Evidence of Good Character of Deceased—When Admissible.—The general rule in homicide cases is that it is not competent to introduce evidence for the purpose of proving the good character of the deceased until his character has been assailed, and evidence of assaults made on the accused by the deceased is not such an attack on the character of the deceased as would authorize the admission of evidence of good character; but when it was competently shown that the deceased was ill-mannered or insulting towards men and women and children generally, it would be admissible to prove his good character in these respects, although the evidence might not be directed toward establishing that he was a violent, dangerous or quarrelsome man.

6 Criminal Law—Evidence—In Rebuttal—Practice.—The correct practice is that both parties should introduce in chief all of the evidence they have tending to support their respective contentions, but it is allowable to introduce in rebuttal evidence that might have been introduced in chief, and as a general rule the time of introducing evidence is left to the discretion of the trial judge and will not be interfered with unless it has been abused. Criminal Law—Rebuttal Evidence—Practice.—When the Commonwealth or the defense is allowed to introduce material evidence in rebuttal, whether it be for the purpose of contradiction or evidence in chief, the other side should also be allowed to introduce evidence to explain away or contradict this rebutting evidence.

8. Criminal Law—Argument—Time Allowed for.—A reasonable time should always be allowed for argument, and what is a reasonable time must of necessity be left almost entirely to the

discretion of the trial court, but in a homicide case, where there are a large number of witnesses and much conflicting evidence, an hour is not sufficient time in which to enable counsel to present his case.

BLACK & OWENS, GOLDEN & LAY, J. D. TUGGLE, V. C. McDONALD, C. POWERS and B. B. GOLDEN for appellant.

JAMES GARNETT, Attorney General, CHAS. H. MORRIS, Assistant Attorney General, and J. M. ROBSION for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

The appellant, Nora Childers, under an indictment charging her and Nelson Berry and Joe Berry with the murder of Charles Childers, was found guilty of voluntary manslaughter, and from the judgment on the verdict she prosecutes this appeal, asking for a new trial.

The deceased, Charles Childers, and the appellant, Nora Childers, had been married about eleven years, and were living together in the city of Barbourville as husband and wife at the time of his death, in December, 1912, which resulted from wounds inflicted by pistol shots while he was at the house of Joseph Berry, who was the father of his wife.

At the time of the shooting, from the effect of which Charles Childers almost immediately died, there were present in the room where it occurred, at about six o'clock in the evening, Joseph Berry and his wife, the mother of the appellant, Nelson Berry, her brother, and his wife, and the appellant and her daughter, Georgia Childers, a child about nine years of age.

It was the theory of the Commonwealth, supported by evidence, that when the deceased opened the door and walked into the room in which these people were seated, the appellant first shot him twice with a pistol, and then Nelson Berry shot him twice, after which Joe Berry fired two other shots that struck him; and that he was killed without provocation and pursuant to an arrangement or conspiracy between the Berrys and appellant.

While the theory of the defense was that the deceased came into the room in a drunken, threatening manner and caught the appellant in the hair of her head with his left hand, jerking her out of the seat, and at the same time cursing her, while he had his right hand in his right-hand pants' pocket; that when this assault was made on appellant, her brother, Nelson Berry, took hold of the deceased, who thereupon turned from his wife and ap-

proached Joseph Berry in a threatening, violent manner, and that Joseph Berry then shot him five times, no other shots being fired.

With this brief statement, we will at once take up the grounds relied on for reversal:

1. It appears, from the bill of exceptions, that on the trial of the case, after the regular panel had been exhausted, the court directed the sheriff, S. L. Lewis, to proceed to Wilton and on Indian Creek around Wilton, in Knox county, and summon forty-five men to appear in the court for jury service, to which direction the attorneys for appellant objected and excepted; but the court stated that the citizens around Indian Creek and Wilton were as fair-minded as in any part of the county and knew as little about this case as people in any part of the county, and thereupon the sheriff, in accordance with the directions of the court, proceeded to summon from that part of the county indicated the requisite number of jurors. After this, other objections to the jurors so summoned and to the panel were made and overruled.

The action of the court, in ordering a jury to be summoned, has been left, by section 281 of the Criminal Code, to the discretion of the trial judge and is not subject to exception or review on appeal. This section provides that "The decisions of the court upon challenges to the panel, and for cause, or upon motions to set aside an indictment, shall not be subject to exception." And we have uniformly ruled that error, if there be one, in the manner of obtaining or selecting the panel, is not available in this court. Deaton v. Com., 157 Ky., 308. It might further here be repeated what was said concerning this section in Ellis v. Com., 146 Ky., 715:

"It must be admitted that this section and the construction given to it places great and unrestrained power in the hands of the trial judge in the selection of a jury, but it is not to be assumed that a judge will exercise it in an arbitrary or unjust manner or so abuse his office or discretion as to knowingly or purposely deny either to the Commonwealth or to the accused the right to select a jury in the mode pointed out in the Code and Statutes. But, however this may be, it is certain that in this case the trial judge did nothing to affect either the rights of appellant or the Commonwealth."

2. For the purpose of showing the motive that the appellant had for killing or aiding in the killing of her husband, Mrs. Hignite, a witness for the Commonwealth,

over the objection of counsel for the appellant, was permitted to testify about a scene and conversation that she saw and heard between appellant and the deceased some six years before he was shot and killed. This witness after testifying that she was well acquainted with the parties, who were at that time conducting a store, said: "One evening I went in their store, and Mr. and Mrs. Childers were there alone. It was after I had had supper, and I went in and Mrs. Childers looked like she was mad. I says, 'Nora, what is the matter with you?' and she looked at Mr. Childers and cursed him and said he had said a girl that passed was pretty and called the girl a vile name; I says, 'That is not anything, she is just a child'; and Mr. Childers was writing and making out orders. When he got through, he came up and put his arm around her and says, 'I don't want my little woman to be mad,' and she come at him with a hat pin and says, 'G— d— you, I'll kill you'; when she done that I turned and walked out. Q. Did you hear the defendant at any other time make any other statement to her husband or offer to injure him in any way? A. Yes, sir. Q. When was that? A. At their home and in the store. Q. When was that? A. I cannot tell how long it had been, but since the time I saw her the first time. Q. What did she do or say at that time? A. If she would be mad at him she would curse him all to pieces, and saying she would kill him."

Andy Gibson, another witness for the Commonwealth, over the objection of counsel, testified that seven or eight years before the trial he heard the appellant, in speaking to her husband, call him a G— d— s— of a b—, and say that she would kill him and that he ought to be killed. "How often did you hear her talk in that manner to her husband? A. I have heard her say that four or five or six times some five or six years ago."

Pleas Byrley, also a witness in behalf of the Commonwealth, testified that about two years before the trial he had a conversation with the appellant. He said: "Me and her were talking about a certain fellow, and I was telling her that I wouldn't treat Mr. Childers in the way she was treating him if I was her; if I loved a fellow I would sue for divorce and go and marry him, and she said he wouldn't have her. She just told me he wouldn't have her; that is, when Childers was living he would not have her, and I think that was about all that was said. We were talking about a fellow by the name of Tom Wil-

liams." This witness further said that a few days after this conversation, he saw Williams and appellant hugging and kissing each other on the porch of her house, in the absence of her husband, and that after this they went into the house, and Williams remained a good part of the night.

Harriet Bruce, testifying for the Commonwealth, said that on the day deceased was killed, the appellant, in speaking of a difficulty she and her husband had had the night before, said: "She said her and Charlie had a racket that night; she said Charlie whipped Georgia and cut the blood out of her, and said she took the whip away from Charlie and knocked him down, and he got up and she knocked him down again, and told him if he ever whipped Georgia any more she would kill him. Georgia was their little girl."

In cases like this it often becomes material and important for the Commonwealth to show the reason or motive that influenced the accused to commit the crime with which he is charged, and it is a uniform rule in criminal practice, especially in cases in which there is doubt as to who was the aggressor, or where, as in this case, complicity is wholly denied, to permit the Commonwealth to give evidence of any pertinent facts or circumstances tending to show threats, ill-will or bad feeling on the part of the accused toward the deceased, or a motive that may have contributed to influence the commission of the act. Underhill on Criminal Evidence, Section 323; Roberson's Criminal Law, Vol. 1, Section 246; Franklin v. Com., 92 Ky., 612; O'Brien v. Com., 89 Ky., 354; Mathley v. Com., 120 Ky., 389; O'Brien v. Com., 115 Ky., 608.

In the trial of this case it was especially important that the Commonwealth should have been permitted to show the state of feeling appellant had for her husband and the causes operating upon her mind that might probably have influenced her to desire to be rid of him. They were husband and wife, and as such were living together at the time he was killed, and her defense was that she had no part in the taking of his life. The witnesses to whose testimony we have referred related facts and circumstances conducing to show that the appellant and her husband had serious quarrels, resulting in assaults, the exchange of abusive language, the making of violent threats, and other acts manifesting that, although living together as husband and wife, their relations were often marked by conduct indicating that their married life was

not at all times either agreeable or happy, and that the appellant occasionally was guilty of improper conduct with other men, and expressed, although perhaps indirictly, the wish or hope that she might be free to make other matrimonial engagements. We think this evidence, unless it be that it was too remote from the transaction being investigated, was clearly competent; and, likewise, it was admissible for the appellant to rebut the force of this evidence by showing, as she did, that the relations between her and her husband were happy.

The contention that the evidence referred to on the part of the Commonwealth was too remote to be admissible, we think goes rather to the weight than to the competency of this evidence. It is entirely likely that the incident referred to by Mrs. Hignite, and which occurred several years before the deceased was killed, would be, by itself, too remote to throw any relevant light on the subsequent relations of appellant and her husband, but taken in connection with the evidence of the other witnesses, it tended to show a continued state of bad feeling between them, beginning with the quarrel related by Mrs. Hignite and ending with the quarrel related by Harriet Bruce that occurred the day before the deceased was killed.

It is also urged that when this evidence was admitted the court should have admonished the jury that it was competent only for the purpose of furnishing a motive that may or may not have induced the appellant to commit or aid in the commission of the crime.

It is a general rule of the criminal law that where evidence of other offenses is competent, it is the duty of the court to admonish the jury, at the time of the introduction of the evidence, that it is only admitted for the purpose of showing, if it does show, a motive for the commission of the crime for which the accused is being tried; but when the evidence, as in this case, merely goes to show the state of feeling on the part of the accused towards the deceased that might have induced her to kill or aid in killing him, we do not think it was necessary to admonish the jury concerning the purpose for which it was admitted. There are a great many homicide cases in which the Commonwealth, for the purpose of showing malice or motive, introduces evidence of threats and other acts tending to show ill-feeling or ill-will on the part of the accused toward the deceased, and when the evidence is introduced for this purpose, it is not required

that the trial judge shall give any admonition to the jury. They have the right to hear it and receive it as other evidence, because its purpose is not to show the commission of another crime, but only to show the state of feeling existing between the accused and the deceased, or the influences operating on the mind of the accused.

3. The Commonwealth was allowed to introduce evidence of the good character of the deceased when his character had not been put in issue by the appellant. In other words, although the appellant did not seek to prove that the deceased was a person of bad character or a violent, dangerous or quarrelsome man, the Commonwealth was allowed to show that he was a man of good habits, well-disposed, peaceable and quiet in his manner and disposition. On the part of the Commonwealth, it is argued that this evidence was competent in view of the testimony of appellant that the deceased often abused, assaulted and mistreated her, and for the purpose of rebutting the presumption raised by her evidence that he was a violent, quarrelsome, insulting and brutal man in his relations toward his family.

The general rule in homicide cases is that it is not competent to introduce evidence for the purpose of proving the good character of the deceased until his character has been assailed. Parker v. Com., 96 Ky., 212. So that the question here presented is, was the evidence for the appellant tending to show that the deceased was quarrelsome, brutal and abusive towards his family, such an assault on the character of the deceased as would permit the Commonwealth to introduce rebutting testimony? We think not. The evidence introduced by the appellant did not reflect on the general character of the accused or his manner or conduct towards men or women or children generally, but only his manner and conduct towards the appellant. This evidence was brought out by the appellant for the purpose of explaining what occurred during the quarrels between her and her husband testified to by Mrs. Hignite, Harriett Bruce and other witnesses, and was not broad enough in its scope or effect to warrant evidence of the general peaceable, quiet and well-behaved character of the deceased. We think, however, that in cases in which it might be competently shown by the accused that the deceased was ill-mannered or insulting or rude towards women or children or men generally, it would be competent to prove the good character of the accused in these respects, al-

though the evidence for the defense might not be directed towards establishing that the deceased was a violent or dangerous or quarrelsome man. It was, therefore, error to admit evidence of the good character of the deceased.

4. The Commonwealth introduced much evidence in rebuttal that should have been introduced in chief. The correct practice is that both parties should introduce in chief all of the evidence they have tending to support their respective contentions; but it is allowable and common practice to introduce in rebuttal evidence that might properly have been introduced in chief, and, as a general rule, this court leaves the regulation of the introduction of evidence to the trial judge, and it is only in rare cases that his discretion in allowing evidence in rebuttal will be disturbed. But in this case, after allowing Wharton Stamper and Stephen Stamper, who were two of the principal witnesses for the Commonwealth in chief, to be recalled and testify in rebuttal that when the appellant told them she had shot the deceased, her mother, who was present, said, "Hush, child, keep still, you know you had to do it," the court refused to allow other witnesses, who said they were present when this conversation took place and heard what was said by appellant and her mother, to testify that the mother did not make the statements attributed to her by the Stampers. The evidence of the Stampers was, we think, competent in rebuttal for the purpose of contradicting Mrs. Berry, who was inquired of about this matter when she was testifying as a witness for the appellant, and the court properly admonished the jury when the Stampers testified in rebuttal that their testimony should only be received by the jury for the purpose of contradicting Mrs. Berry and for no other purpose. But the statements made by these Stamper boys were very damaging evidence, and we think the court committed error in refusing to permit others who were present to say that no such statements were made.

There was some other evidence introduced by the Commonwealth in rebuttal in reference to the extent that powder fired from a pistol would mark or burn clothing or flesh, which evidence was material for the Commonwealth in the development of its case. After this evidence had been introduced, the defense offered evidence in contradiction of what was said on that subject by the witnesses for the Commonwealth, but the court refused to permit these witnesses to testify, and in this respect, we think, error was committed.

In short, when the Commonwealth or the defense is allowed by the court to introduce material evidence in rebuttal, whether it be for the purpose of contradiction or as evidence-in-chief, the other side should also be allowed to introduce evidence to explain away or contradict this rebutting evidence. Evidence in rebuttal is just as damaging, often more so, than like evidence would be if offered in chief, and, if it would be competent to explain away or contradict the evidence if offered in chief, it would certainly be admissible to permit it to be explained away or contradicted when offered in rebuttal.

5. Much complaint is made of the argument of counsel employed to assist in the prosecution, and who was permitted to close the case for the Commonwealth in place of the Commonwealth's Attorney. It would serve no useful purpose to repeat here the objectionable argument by counsel in the closing speech to the jury. That it was objectionable, does not admit of doubt. For example, counsel referred to material evidence that the court had excluded, saying: "Just as soon as we began to ask them about that, they said that there was nothing in the Williams business, and when I put the question to them if they were not thrown out of the hotel at Knoxville, then they objected."

We have several times severely criticized attorneys for the Commonwealth for going outside of the record in argument for the purpose of influencing the passions or prejudices of the jury, and especially has it been regarded as misconduct on the part of counsel to call the attention of the jury to material evidence that the court had excluded from their consideration. It is scarcely necessary to repeat what has been so often said by this court concerning the limitations upon the argument counsel for the Commonwealth may make. That has been fully stated in Slaughter v. Com., 149 Ky., 5.

6. In instruction number four the court evidently by inadvertence used the name of Nelson Berry, when it appears that the indictment against Nelson Berry had been filed away.

7. It is also complained that the court erred in limiting the argument of counsel on each side to one hour. A reasonable time, of course, should always be allowed for argument, but what is a reasonable time must, of necessity, be left almost entirely to the discretion of the trial court, and it is only when this discretion has been plainly abused that we will interfere. We think, how-

:ever, that in a case like this, where there were a large number of witnesses and much conflicting evidence, an hour was not sufficient time in which to enable counsel to properly present the case. Williams v. Com., 82 Ky., 640; Thompkins v. Com., 117 Ky., 138.

After a careful consideration of the whole case, we think that the errors mentioned entitle the appellant to a new trial. Wherefore, the judgment is reversed, and the case remanded for a new trial.