## Daniel, et al. v. Commonwealth.

(Decided June 20, 1913).

## Appeal from Owsley Circuit Court.

1. Indictment—Endorsement—Record.—An indictment which bears on its cover an endorsement that it has been received from the hands of the foreman of the grand jury in its presence in open court and filed in open court which endorsement is signed by the clerk, is a sufficient compliance with the code, without such endorsement being copied into the order book.

2. Indictment—Conspiracy—Sufficiency and Certainty.—The purpose of an indictment is to advise the accused of the offense with which he stands charged and for which he is to be tried. An indictment for conspiracy, which charges the defendants with combining together for an unlawful purpose, and in furtherance of such unlawful purpose, they or some one of them or some unknown person acting with them committed the unlawful act, the others being then and there conveniently near aiding and abetting sufficiently charges all with being principals and the indictment is good.

3. Criminal Law—Trial—Formation of Jury—Appeal—Review.—Error of the court in the formation of a jury to try one charged with a crime or offense is not subject to review by the court of appeals.

4. Homicide—Evidence—Dying Declarations—Admissibility.—In a prosecution for homicide, statements of the injured party, made under a positive and absolute belief that his death is certain to ensue, and death results, are admissible as dying declarations, without regard to length of time intervening between the time of making the statements and his death.

5. Homicide—Conspiracy—Trial—Instructions.—In a prosecution for homicide as a result of conspiracy, instructions are not erroneous, under which the jury, before it was authorized to find any one of the accused guilty, it was necessary to find from the evidence, beyond a reasonable doubt, first, that a conspiracy had been formed by the accused, to commit murder, second, that, in pursuance of said conspiracy, murder was committed by one or more of the accused, or by some other unknown person or persons, and third, that the others of accused were then and there present or conveniently near aiding them in so doing.

6. Homicide—Conspiracy—Appeal—Review—Evidence — Weight and Sufficiency.—In a prosecution for homicide as a result of conspiracy, evidence held to support verdict and judgment.

A. H. PATTON, C. W. HOGG, H. C. EVERSOLE and WILLIAM CLARK for appellants.

JAMES GARNETT, Attorney General; OVERTON S. HOGAN, Assistant Attorney General for appellee.

Opinion of the Court by Judge Lassing—Affirming.

The grand jury of Owsley County, at its June, 1912, term, returned an indictment against Bradley Daniel, Jerry Rice, W. E. Rice, Ben Rice, E. C. Garnett, Robert Brandenburg, Harvey Sandlin, Ancil Vires and James Smith, charging them with the willful murder of Wilson Gabbard, by conspiring and confederating together and with each other and other persons, unknown to the grand jury, to kill and murder said Gabbard, and, in pursuance and furtherance of said conspiracy, actually killing him or causing him to be killed. The indictment is, in words and figures, as follows:

"The grand jury of Owsley County, in the name, and by the authority of the Commonwealth of Kentucky accuse Bradley Daniel, Jerry Rice, W. E. Rice, Ben Rice, E. C. Garrett, Robert Brandenburgh, Harvey Sandlin, Ancil Vires and James Smith of the crime of willful murder committed in manner and form as follows:

The said Bradley Daniel, Jerry Rice, W. E. Rice, Ben Rice, E. C. Garrett, Robert Brandenburgh, Harvey Sandlin, Ancil Vires and James Smith and other persons to this grand jury unknown in the said county of Owsley and State of Kentucky on the 8th day of June, 1912, and before the finding of this indictment unlawfully, willfully, feloniously and of their malice aforethought and with intent to bring about the death of Wilson Gabbard and procure him murdered, did conspire together and with each other and with other persons to the grand jury unknown and the said Bradley Daniel and Jerry Rice and other persons to this grand jury unknown in pursuance of said conspiracy and in furtherance of same and while said conspiracy existed did on the said 8th day of June in Owsley County, Kentucky, and before the finding of this indictment unlawfully, willfully, feloniously and of their malice aforethought shoot and wound the said Wilson Gabbard with guns and pistols loaded with powder and ball and other hard and explosive substances from which shooting and wounding the said Gabbard died, and the said W. E. Rice, Ben Rice, E. C. Garrett, Robert Brandenburgh, Harvey Sandlin, Ancil Vires and James Smith in Owsley County, Kentucky, on the said 8th day of June, 1912, and before the finding of this indictment did unlawfully, willfully, feloniously and of their malice. and aforethought, counsel, advise, encourage, aid and procure the said Bradley

Daniel and Jerry Rice and other persons acting with them but unknown to the grand jury, unlawfully, willfully, feloniously and of their malice aforethought to kill and murder the said Wilson Gabbard, which one of the last named (Bradley Daniel and Jerry Rice) or another person acting with them, but who is to this grand jury unknown, so as aforesaid then and there, thereunto by the said W. E. Rice, Ben Rice, E. C. Garrett, Robert Brandenburgh, Harvey Sandlin, Ancil Vires and James Smith before the fact counseled, advised, encouraged, aided and procured, did, by shooting and wounding the said Wilson Gabbard with guns and pistols loaded with powder and ball and other hard and explosive substances and from which said shooting and wounding the said Wilson Gabbard died.

"Against the peace and dignity of the Commonwealth of Kentucky."

Each of the accused entered a plea of not guilty. Upon trial before a jury Bradley Daniel, Jerry Rice, James Smith, W. E. Rice, Ancil Vires and Harvey Sandlin were found guilty, as charged in the indictment, and their punishment fixed at confinement in the penitentiary for life. E. C. Garrett and Ben Rice were, by the jury, found not guilty. On his own motion, the court peremptorily instructed the jury to find for Robert Brandenburgh, which was done. A motion and grounds for a new trial was filed by the six defendants found guilty which being overruled, they prosecute this appeal and seek a resersal upon several grounds.

It is first insisted that the indictment is defective and a demurrer thereto should have been sustained. This contention is rested upon the idea that the record does not show that the indictment was filed in court. The indictment is endorsed "True Bill" and this endorsement is signed by the clerk. Section 121 of the Criminal Code provides: "The indictment must be presented by the foreman in the presence of the grand jury to the court, and filed with the clerk and remain in his office as a public record." The record in this case shows that the indictment bears upon its cover the following endorsement: "Received from the hands of the foreman of the grand jury in the presence of the grand jury in open court and filed in open court this July 2, 1912. Ike Wilder, Clerk." This is a literal compliance with the provisions of the statute, and we fail to see wherein any just ground of complaint is afforded appellants, even

though the record book of the circuit court does not contain a copy of this endorsement.

It is next insisted that the indictment is defective because it does not charge all of the defendants with being principals. True, it does not charge all with doing the shooting, but it does charge all with entering into a conspiracy for the purpose of encompassing the death of Wilson Gabbard, and, in furtherance of said conspiracy, of actually killing him, all being present aiding, counseling, advising, abetting and assisting in the killing while it was being done. A similar objection was made to an indictment, in all of its essentials like the one under consideration in the cases of Commonwealth v. Hargis, 124 Ky., 356, and Anderson v. Commonwealth, 144 Ky., 215. The question was elaborately discussed in those two opinions, particularly in the latter, and it is unnecessary to further consider it here. The purpose of the indictment is to advise the accused of the offense with which he stands charged and for which he is to be tried. If the indictment meets these requisites, the demands of the law are fully satisfied.

The language used in the indictment under consideration makes plain three propositions: First, that the accused banded themselves together for the purpose of killing Wilson Gabbard; second, that, in furtherance of said arrangement or conspiracy so to do, they or some one of them did actually kill him; and third, the others being then and there present or conveniently near, aided and assisted in so doing. The indictment was good, and the trial court properly overruled the demurrer thereto,

It is next complained that the court erred in sending to Jackson County for a venire of men, over the objection of appellants, from which the jury which tried appellants was made up. It appears that, when the case was called for trial, the Commonwealth's attorney made a motion under section 1112, Kentucky Statutes, for a change of venue. This motion was overruled. Thereupon, he filed a petition for a change of venue, notice being waived by appellants, On this motion the court heard proof at length, after which he again overruled the motion for a change of venue, and upon his own motion and over the objection of the accused, sent to Jackson County an order for a venire of sixty men, from which the jury was to be made up. It is insisted that this was error.

No complaint is made that the jury, which tried appellants, was not a lawful jury, or that any man who sat thereon was not qualified to sit in the case, but it is urged that the accused had a constitutional right to be tried by a jury of the vicinage, and that the court was without power or authority to send into another county for a jury, until he had satisfied himself by actual effort that no jury could be procured in that county to try the case. The cases of Wilson v. Commonwealth, 140 Ky., 1, Spencer v. Commonwealth, 122 S. W., 800; Collins v. Commonwealth, 143 Ky., 60; Blanton v. Commonwealth, 147 Ky., 812, and Commonwealth v. Harris, 147 Ky., 702, are relied upon as supporting this position. It is further urged that the very fact that the court found that there was no necessity for a change of venue is the best evidence that he erred in sending into another county for a jury.

It is likewise urged that, if a jury had been procured from Owsley County, they would necessarily have been more or less acquainted with the witnesses who testified in the case, and with their character and general reputation, and in this way have been better able to judge of their credibility. Counsel for appellants seem to have overlooked the fact that it is the duty of a jury to try the case by the evidence before them rather than from any personal knowledge they might have of the witnesses and their credibility. If the witnesses, who were introduced before the jury, were not worthy of belief, counsel might have established this fact by evidence, but they cannot complain that the court erred in permitting the case to be tried by jurors, whose acquaintance with the witnesses was not such as to enable them to pass upon their credibility without the aid of evidence.

The record shows that the court heard evidence upon the question of the change of venue and, while there is no transcript of that evidence before us, we must presume that a state of facts was there developed which justified him in sending into another county for a jury. The record shows that there was a great array of witnesses in this case, and he doubtless found it more convenient to the witnesses and litigants to procure a jury from another county than to transfer the case. But, whatever may have been his reason for so doing, he merely exercised that discretion which the law gives him in determining questions of this character. As said in Hargis v. Commonwealth, 135 Ky., 578, "The circuit court

has a wide discretion in matters of this sort, and this court will not interfere where the discretion has not been abused. The trial was had in the county of Estill, and a large part of the jury was brought from Madison County. The case had been tried once before, and the circuit judge finds as a fact that he could not obtain a jury in Estill County after having made a fair effort in good faith to obtain a qualified jury free from bias, by reason among other things, of the wide circulation given the facts of the case. Matters of this sort are by section 281 of the Criminal Code of Practice, committed to the discretion of the circuit judge, and, as by that section no exception can be taken to his ruling, it is not subject to review here.'' To the same effect is Sergent v. Commonwealth, 133 Ky., 284.

But, it is insisted that by the act of the Legislature, approved March 23, 1910 (Acts 1910, Chap. 92), section 281 of the Criminal Code, was so amended as to authorize this court to consider and pass upon the correctness of the court's ruling in impaneling a jury. Section 281, as amended by the act of 1910, provides: ''The decisions of the court upon challenges to the panel and for cause, or upon motions to set aside an indictment, shall not be subject to exception.'' Prior to the adoption of this amendment, this court was without authority to pass upon the correctness of the court's ruling upon a motion for a new trial. By this amendment, the words ''and upon motions for a new trial'' were stricken from section 281, thereby giving to this court power to review the action of the trial court in passing upon a motion for a new trial. There remained, however, the inhibition against the right of this court to review the action of the trial court in the formation of the jury. While this ground relied upon for reversal cannot avail, we are satisfied from a consideration of the record that the court did not abuse his discretion in sending into another county to secure a jury of fair-minded, disinterested, and impartial men to try appellants.

The next ground relied on for reversal is, error of the court in admitting incompetent evidence. This, in the main, consisted of dying declarations or statements of Wilson Gabbard. He was shot about six o'clock in the morning on Saturday June 8th. He died on Sunday night following, sometime between midnight and morning, so that he lived less than forty-eight hours from the time he was shot. He said, immediately after he was

shot, that he was going to die and he knew he was going to die, and to this statement he steadfastly adhered until he became unconscious a few hours before his death.

Upon this point, three witnesses testified. Two, from memory, and one from notes made at the time the statement was made to him by deceased, and it is of this evidence that complaint is made. Inasmuch as the written statement contained only facts about which the witnesses agreed, we fail to see wherein appellants were, in any wise, prejudiced by having it read to the jury instead of having the witness testify as to those facts from memory. Indeed, there is no contrariety of opinion among the witnesses as to what deceased said concerning the way and manner in which he was shot and who shot him. If this evidence was competent, we fail to see wherein the court erred in permitting as many witnesses as heard the statement to detail it to the jury.

As stated, he was shot about six o'clock in the morning and he told Mary Gabbard, his mother, who was the first person to reach him, that he was killed, that he was going to die, and that Jerry Rice and Bradley Daniel had shot him. The doctor did not reach him until about noon, or shortly after noon of the same day, and he told him, in substance, the same thing. Although the doctor, in order to buoy him up, told him that there was a chance for him to recover, he insisted that there was not and that he was going to die. Under a long line of authorities, this evidence must be held competent as dying declarations, unless it be held that they were made too great a length of time before the victim's death.

The former statement was made perhaps as long as thirty-six hours, and the latter about thirty hours, before his death. In Wilson v. Commonwealth, 22 Rep., 1251, it was held that a statement made and written the day before the death, when it appeared that the deceased had given up all hope of recovery, was properly admitted as a dying declaration. In Burton v. Commonwealth, 24 Rep., 1162, it was held that a dying declaration made eleven days before death was admissible.

The principle upon which evidence of this character is admissible at all is that the declarations are made under a sense of a speedy death, and although death may not result for several days after the declaration is made, if at the time it is made the person who makes it believes that he is going to die and has abandoned all hope of recovery, and death thereafter ensues as a result of the in-

jury, the statement is competent as a dying declaration. As stated by Wigmore in his excellent work on Evidence, Vol. II, section 1440: "It follows, from the general principle, that the belief must be, not merely of the possibility of death, nor even of its probability, but of its certainty. A less stringent rule might with safety have been adopted; but this is the accepted one. The tests have been variously phrased; there must be 'no hope of recovery;' 'a settled expectation of death;' 'an undoubting belief.' Their general effect is the same. The essential idea is that the belief should be a positive and absolute one, not limited by doubts or reserves; so that no room is left for the operation of worldly motives."

When a statement is made under such circumstances, the law presumes that the solemnity of the occasion supplies the place of the oath, the state of mind, in which the one making such utterances at the time, being assumed as calculated to free it from all ordinary motives to misstate the truth. As early as 1595, the dramatist, Melun, thus portrayed the frame of mind of one whose statement might be received as a dying declaration:

"Have I not hideous death within my view,
Retaining but a quantity of life,
Which bleeds away, even as a form of wax
Resolveth from his figure 'gainst the fire?
What in the world should make me now deceive,
Since I must lose the use of all deceit?
Why should I then be false, since it is true
That I must die here and live hence by truth."

The statement made by deceased to his mother, who ran to him immediately that he was shot, might well have been admitted as a part of the *res gestae*. Certainly, under the evidence in this case, it together with the statement to the doctor and the magistrate, who reduced it to writing, was properly admitted as a dying declaration, for the deceased, during all the time from the moment he was shot until he was unconscious, clearly demonstrated that he had abandoned all hope of recovery and realized that he must die. Well might he have entertained such a feeling, for the soft nosed bullet, with which he was shot, had plowed its way through his vitals and left a ghastly, gapping wound, beyond the power of medical skill to heal.

It is next insisted that the court did not properly instruct the jury. There is no merit in this contention. The instructions given cover every possible phase of the

case and presented to the jury, fully and fairly, appellants' defense. Under the instruction, before the jury was authorized to find any one of appellants other than Jerry Rice and Bradley Daniel guilty, it was necessary that it should find from the evidence, beyond a reasonable doubt, first, that a conspiracy had been formed by appellants to kill Wilson Gabbard, second, that in pursuance of said conspiracy, he was killed by one or more of appellants, or some other unknown person or persons, and third, that the others of appellants were acting with them, being then and there present or conveniently near, aiding, assisting, advising, or encouraging them so to do.

While under their plea of not guilty, appellants put in issue every material fact and circumstance necessary to establish their guilt, their real defense was that they did not do the shooting, that they formed no conspiracy, that they entertained a kindly feeling toward deceased, and that, at the time he was killed, they were at another place, at least a mile and a half or two miles distant from the scene of the shooting. If the jury had believed the evidence offered by appellants to establish these facts and accepted their theory and defense as true, under the instructions as given by the court, it would necessarily have been compelled to find the appellants not guilty. If, on the other hand, it accepted the evidence offered by the Commonwealth as true, it was fully justified and supported in its finding, for the Commonwealth showed a state of facts from which the jury was fully warranted in finding all of appellants guilty. In addition to the instructions dealing with all of the appellants, in another appropriate instruction, the court authorized the jury to find Jerry Rice and Bradley Daniel guilty, if they believed from the evidence beyond a reasonable doubt that they, or either of them, fired the shots which killed deceased. Under this instruction, the jury would have been warranted in finding these two guilty, although they may have found that the Commonwealth had failed to make out a case of conspiracy involving the other appellants. The law of the case, as warranted by the charge and the evidence introduced, justified and authorized the court in giving the instructions which he did. They are such as have been frequently approved by this court in cases where the charge of murder, as a result of a conspiracy, was involved.

The only remaining question is, does the evidence support the verdict? A conspiracy is always difficult to

prove. The fact that those contemplating the commission of a crime have banded themselves together for the purpose of committing it is rarely established by direct, positive evidence of such crime, but, in a majority of cases, must be shown by circumstances which, when put together into a composite whole, evidence such a purpose on their part. The evidence in the case before us is of that character.

Ill-feeling is shown to have existed for sometime between certain members of the Rice family and certain members of the Gabbard family. William Rice was engaged in the mercantile business in that locality. A few weeks before the death of Wilson Gabbard, he had set up an opposition business near that of William Rice. A few days thereafter, William Gabbard was shot and wounded by some unknown person. Still a few days later, Ed. Garrett, closely allied with the Rice family, alleges that he had been shot at by some unknown person from ambush. From information gathered by him through detective work performed by female relatives and friends, he conceived the idea that his would-be assassin was a brother-in-law of Wilson Gabbard. This condition of affairs had the effect of creating in that locality a feeling of suppressed excitement, which was intensified on Friday evening before Wilson Gabbard was assassinated, by the discovery on the part of a son-in-law of William Rice of an armed man skulking on the mountain side in close proximity to the homes of William Rice and Dan Rice, his son.

It is testified to for appellants that, immediately upon the making of this discovery, two of appellants were dispatched to the home of Richard Rice, father of William Rice, where he had gone for the alleged purpose of sitting up with his sick mother. They found him there and acquainted him with these facts. It is admitted that each of these messengers was armed, one with a Winchester rifle and the other with a shotgun. What passed between them, further than that they acquainted William Rice with the purpose of their mission, the Commonwealth was unable to show. But, it is admitted by them that, after remaining at the home of Richard Rice until about two o'clock that night, William Rice, his son, Jerry, Bradley Daniel, James Smith and Harvey Sandlin who had joined them, left for the ostensible purpose of going to the home of William Rice. They had gone on horseback to the home of Richard Rice on that even-

ing, but they left their horses there and walked, by a circuitous route, through the woods, over an unfrequented road, stopped on their way at the home of Ansel Vires and had him join them. This they admitted, but alleged that it was for the purpose of going home in order to put in a full days work. They say that they went the unfrequented way in order to avoid any possible contact with would-be assassins. Vires says that he joined them in order that he might go to the store of William Rice to get some meat.

Thus, we have an admission on their part, that they met together at the home of Richard Rice, some miles distant from their home, on the evening of the day before Wilson Gabbard was killed, that they remained there until two o'clock when they left together, and that a part of them at least were armed. They state that they went to the home of Dan Rice and remained there until sometime after the hour when Wilson Gabbard was killed.

According to the evidence for the Commonwealth, however, instead of going to the home of Dan Rice, they went on down the mountain side to a point opposite a field which was planted in corn, in which some, at least, of appellants knew that Wilson Gabbard was to have a corn hoeing on that day, and there concealed themselves until he came out of his house down to the branch preparatory to entering this field, at which point he was fired upon and killed. In his dying declaration, deceased stated that he recognized Jerry Rice and Bradley Daniel as having shot at him and shot him. Another witness for the Commonwealth testifies also that he recognized Jerry Rice and Bradley Daniel as two of the three who fired upon deceased. In addition to this, the Commonwealth showed by two witnesses that, shortly after they heard several shots fired up in the direction of Wilson Gabbard's home, they saw appellants coming down the mountain side from in the direction in which the firing was heard, pass over the creek, and up the hillside beyond, that they recognized each of appellants and that they were armed. The Commonwealth proved by another witness that on the evening before the assassination, Ansel Vires left his home, and that William Rice called at the house of these witnesses and asked if Ansel Vires had returned, and that a short time thereafter William Rice and Ansel Vires passed his house going toward the top of the mountain. Amanda Cornett tes-

tifies that she heard her husband, the evening before the assassination, ask Vires if he was going to William Rice's the next day, to which Vires replied that he was, but did not want anything said about it, for there was no telling what was going to happen the next day. Nancy McIntosh testified that, on the evening before the assassination, she saw appellants, James Smith and William Rice, going along the road, and she concealed herself behind some bushes, that they were talking, and as they passed her she heard William Rice say "there was not aimed to be a Gabbard left."

These statements, when taken in connection with the conduct of appellants in gathering at the home of Richard Rice on the evening that they did, leaving there armed at two o'clock at night, walking by a circuitous route through the woods, going out of their way to the home of appellant, Vires, having him join them, having been seen by two witnesses coming from in the direction of deceased's home shortly after the firing was heard in that direction, were certainly evidence of such gravity as to justify the trial judge in refusing to take the case from the jury.

William Rice testifies that when his son, Jerry, and Bradley Daniel notified him that an armed man had been seen skulking through the bushes near his home, he discussed the matter with his father, and his father became alarmed for his own safety. While he testifies that there was no discussion as to the probable identity of this man, their conduct when read in connection with the evidence to the effect that Ed. Garrett, his business associate, believed that an attempt had been made by Wilson Gabbard's brother-in-law to assassinate him one or two days before, and the further evidence that he was heard to say to his brother-in-law, Smith, on the evening before, "that there was not aimed to be a Gabbard left," justifies the belief that when they left Richard Rice's house on that night, a plan of action had been agreed upon, and this idea is accentuated when the evidence of what Ansel Vires is alleged to have said to the husband of Amanda Cornett on the evening of the assassination is considered. If this evidence and the evidence for the Commonwealth to the effect that they were seen coming from in the direction of Wilson Gabbard's a short time after the shooting is to be believed, the jury was fully warranted in returning the verdict which it did.

While each of appellants insists that he entertained no unfriendly feeling toward the deceased, no one of them went near him or to his home to inquire about him after they learned that he was shot, or did or said anything that could be construed into a manifestation or expression of surprise or regret on their part that he was shot.

Much evidence was introduced by both the Commonwealth and in behalf of the accused that the reputation of several of the witnesses, who testified in this case, for truth and veracity was not good, but, when the evidence is considered in its entirety, we are constrained to hold that it is sufficient to support the verdict. While there are some contradictions and many circumstances brought out in the evidence, which are not made clear and are not easily understood, still one cannot read this record without being impressed with the idea that appellants deliberately planned the assassination of Wilson Gabbard and carried it into execution.

We find no error in the record prejudicial to appellants' substantial rights, and the judgment is, therefore, affirmed.