## Gabbard v. Commonwealth.

(Decided June 19, 1914.)

### Appeal from Owsley Circuit Court.

1. **Criminal Law—Conspiracy—How Proved.**—In order to prove a conspiracy it is not necessary to prove an express agreement or compact between the conspirators by direct evidence. A conspiracy may be proved inferentially or by circumstantial evidence.

2. Criminal Law—Witnesses—Impeachment—Evidence.—Where the accused testifies in his own behalf it is improper for impeaching witnesses to testify as to his reputation when their opinion is gained solely from what they have heard said of his reputation since the offense was committed. Evidence of character is confined to a time prior to the commission of the offense.

3. Criminal Law—Impeachment of Witnesses—When too Late to Impeach Witnesses.—Where all the evidence has been introduced for the defense, and the Commonwealth has finished its testimony in rebuttal, it is then too late for the defense to introduce evidence to impeach the character of a witness introduced by the Commonwealth in chief.

4. Criminal Law—Impeachment of Witnesses.—It cannot be said that appellant was prejudiced by the court's refusal to permit evidence impeaching the moral character of one witness when that witness only testified as to the moral character of the accused and some of his witnesses. Appellant did not offer to impeach other witnesses, nor make any avowal with reference to them.

5. Criminal Law—Evidence—Contradiction of Witness.—The court properly refused to permit defendant's witness to testify that immunity had been offered him by a witness for the Commonwealth under certain conditions, when this Commonwealth witness had not been interrogated concerning it, and no ground laid for his contradiction.

6. Homicide—Evidence—Verdict.—On trial of one charged with murder, evidence examined and held sufficient to sustain judgment of conviction.

A. F. BYRD, E. E. HOGG, H. C. EVERSOLE for appellant.

JAMES GARNETT, Attorney General, OVERTON S. HOGAN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE NUNN—Affirming.

Sidney Gabbard was tried and convicted of the murder of Farris Gilbert, and given a life sentence in the State penitentiary. The offense was committed at a country voting precinct on Buffalo Creek in Owsley County at the August primary election, 1913. He was tried at a special term of court in January of this year. The indictment contains three counts. The first charges that the appellant, together with his father, Elisha Gabbard, and his brothers Daniel, Elijah and Michael (Bud), and his nephew, Riley Gabbard, conspired and banded themselves together for the purpose of murdering Farris Gilbert. The second count charges all of these parties

jointly with his murder, and the third charges Sidney Gabbard with the crime, and the others as aiders and abettors.

In some respects this case is a sequel to Daniel v. Commonwealth, 154 Ky., 601, wherein a life sentence was upheld against Daniel and five others for the murder of Wilson Gabbard, a brother of this appellant; that offense having been committed a little over a year before the one we are now considering. The accused here, profiting by the experience of the six men who had murdered their brother, asked for a severance. This request was granted, and the Commonwealth elected to try the appellant, Sidney Gabbard.

The court instructed the jury on each charge in the indictment. As to form, the instructions are not criticized, but appellant insists that there was absolutely no evidence tending to connect him with any conspiracy to murder Farris Gilbert, and for that reason the court erred in giving an instruction on that theory. To determine this question requires a close consideration of the evidence which is presented to us in 650 typewritten pages.

Three men were killed that day, and the appellant was wounded; he claims severely. From the conflicting nature of the evidence, it is difficult to pick out anything in particular as a motive, or as tending to give any excuse for the tragedy. In order to get into the case some explanation of the relationship between the parties is necessary.

The Gilberts and Gabbards are closely related by blood and marriage, and it seems that nearly every witness is in some way related to all the parties engaged in the trouble. We have already shown the relationship between the appellant, and the others indicted with him. Appellant's father had a brother named Mike Gabbard. Grover Gabbard, who was on the Gilbert side of the difficulty, was a son of this Mike Gabbard. The wife of the deceased, Farris Gilbert, was named Mary, and she was a child of Mike Gabbard. Clabe Gilbert, a brother of the deceased, Farris Gilbert, was also killed.

There seems to have been a bitter contest in the race for jailer between Clay Harvey and Rob Wilson. Elisha Gabbard's family, the defendants, were for Harvey. There is evidence to indicate that the Gabbards believed the Gilberts were for Wilson and resented it. The proof shows that Farris Gilbert voted for Wilson, and that some of the Gabbards, one of them at least, were watching closely to see how the Gilberts voted, even to the point of following Farris into the booth.

The Gilberts, Grover Gabbard, and his father, Mike Gabbard, lived some eight or ten miles from the polling place, and the evidence for the Commonwealth shows that after they had voted, and were in the act of leaving for home the shooting began. Old man Mike Gabbard had started home afoot. Clabe Gilbert was on his mule with Squire McIntosh, one of his party, up behind him. Farris Gilbert was on his mule, and had ridden close to a log where his wife was waiting to get on behind him. About this time one Bob Baker came up to Farris, took hold of the bridle reins saying that he wanted to speak to him. Farris says, "Wait until Mary gets on," and Baker says, "No, right now," and lead the mule several steps away to a point near the creek, and began talking to Farris. About this time one Gilbert Harris takes a part. He was on close terms with the Gabbards, although from his name he may have been related to the Gilberts. He was for Harvey in the race for jailer, and called out "Hurrah for Harvey," using a vile name for anybody who voted against him. Grover Gabbard said in substance: "You don't mean that for me? I voted for Harvey and it was my first vote." Harris repeated and applied the vile epithet to him, and at the same time ran his hand under his coat. At this, Grover and Harris both drew their pistols, and Mary Gilbert ran between them. They played for position while Mary begged them not to shoot. They soon got out of range of Mary, and two shots were fired about the same time, and both entered Gilbert Harris' body killing him instantly. Grover fired one of them, and who fired the other is a mystery. The theory of the Commonwealth is, and there is some evidence to support it, that Bud Gabbard was in the rear of Grover, and in line with Harris, and in his effort to shoot Grover, the ball missed him and struck

Harris. Bud denies this. The defendants contend that
Budhead Baker, one of Grover's party, was off to one
side, and beyond Grover, and that he is the man who
fired the other shot at Harris. At all events, Harris is
the only man who died that day facing his foe. One of
the balls entered his breast, and the other his face. Clabe
and Farris Gilbert, who were killed shortly afterwards,
were shot in the back. Grover ran and had nothing
further to do with the trouble, unless perhaps an attempt
to shoot Sidney Gabbard as he ran. At least Sidney says
there was such an attempt. The Gabbards fired several
shots at him as he left, but there is no evidence to show
that they ever touched him; in fact, Grover is a fugitive
and has never been arrested. About the time Grover
shot Harris, as the Commonwealth contends, Sid Gab-
bard, the appellant, shot at Farris Gilbert, striking him
in the left leg. This was the only wound Farris received
in front. He grabbed his leg with his left hand, and with
his right pulled his pistol, and shot at the appellant, strik-
ing him in the stomach. He bled freely, but from his
appearance, as witnesses described, it was all external.
By this time Mary Gilbert had run to her husband who
was off his mule. Old man Lish was standing a short
way off near a gate with his rifle. Clabe Gilbert was
standing by a tree close to where Harris had been shot
with his back to the old man, and calling to Farris, his
brother, to run, that they would kill him. The old man
deliberately leveled his rifle, taking rest on the gate, and
shot Clabe through the back, and as he began to sink,
Bud Gabbard came running down from the voting place,
and also shot him through the back. Clabe died instantly.

Farris and his wife went up the creek a few steps to
a bar or crossing. Just here Riley Gabbard, who was
standing in behind the voting house, fired at them with a
shot gun. One shot hit Mary's slipper, but no others took
effect. Sid Gabbard was standing up near the old man,
his father, and firing at them with a pistol, and as they
were crossing the creek the old man fired again with his
rifle, piercing Farris' left arm from the rear. Farris
fell from the shock and pulled his wife down with him.
He immediately arose, broke loose from his wife, and
went on across the creek into the bushes. It was only a
few steps from the creek to the foot of a high and steep
cliff, or mountain. Up to this time when Farris crossed
the bar, and for him it was a literal crossing, this whole
difficulty as between Sid and Farris could be taken for a

sudden affray, and in which neither party was the instigator nor aggressor, in a premeditated sense, but this view leaves out of consideration some incidents and happenings on the morning of the election, and those of a few days prior to it. These, together with or apart from the things that transpired from the time Farris crossed the creek, tend to take it out of the sudden affray class. The theory of the Commonwealth is, and there is abundant evidence to support it, that Farris was running away and doing his utmost to escape the wrath of the Gabbards. As he disappeared in the bushes, old man Gabbard yelled, "Run him down and kill him, don't let him get away," and several of the Gabbards began firing into the woods. Sid, Dan, Riley, Bud and Young Lige Gabbard all hurried down to the bar, or ford of the creek where Mary stood, and Sid had a shotgun. Mary says she caught hold of them, and begged them not to follow up Farris, and that Dan punched her in the side with his gun, and said he would kill her if she did not get out of the way. They all shot up into the bushes in the direction Farris had gone, and old man Gabbard was still calling to them to hunt him down and kill him. Sid Gabbard says, "Let's not let him get away, let's kill him. You four fellows go right down the creek bank and hunt him out down there." As they left, Mary caught hold of Sid and says, "See here, Sid, for God's sake don't kill Farris," and he knocked her down with his gun. When she got up Sid was looking and watching and listening for Farris, and Mary begging him all·the time not to shoot. He shot once up in that direction, and started through the bushes, Mary following and still begging him not to shoot. In a moment Mary and Sid saw Farris through an opening in the bushes as he was walking up the cliff about thirty yards away. She saw Sid take aim, and shoot him in the back, and Farris fell or pitched out of her sight. She cried out that Sid had killed him. Sid went on up to where Farris lay, and then came back to her and says: "I have left him on his face," speaking of him in the most vile sort of way. Mary went to her husband immediately, and she corroborates Sid's statement in this, that she found Farris dead, lying on his face. This ended the fight.

Mary's screams brought to her relief some timid men who had fled for safety to the top of the hill on the other side of the creek. As reason returned, they col-

lected the remains and laid them out side by side on the front porch of a house near the voting place. They were not taken away until noon next day.

In giving a list of the dead, we had as well include the old man, Elisha Gabbard, who either from remorse, or, as appellant's brief tells us, from chagrin and disgust at the testimony of his brother, Mike Gabbard, given on the trial of this case, committed suicide one night in the jail while the trial was in progress.

An examination of the bodies, as testified to by numerous witnesses, shows that they were all shot in the back except Gilbert Harris, and that the killing of Farris Gilbert, the last man to die, was with a shotgun. It is definitely established that the six or seven buckshot wounds in his body entered his back.

For the Gabbards it is contended, and they swear, that the difficulty was brought on by Grover Gabbard, Mary Gilbert's brother; that he was the aggressor and first drew his weapon on Gilbert Harris, and shot him without any cause; that during the time Grover and Harris had their weapons drawn on each other, the Gabbards were calling and begging Grover not to shoot, and they deny that the election was ever mentioned. They say that Grover had knocked off Budhead Baker's hat and kicked it on the ground, and Farris Gilbert gave it another kick. Gilbert Harris remonstrated with Grover, and said he should not do that. Grover asked Harris what it was to him, at the same time calling him a vile name, and drawing his pistol. Harris then drew his pistol, but moved off to the side in an apparent effort to retreat or escape, but that in spite of their entreaties to Grover, he persisted until he shot Harris and killed him. About the same time they say Squire McIntosh, who was off to one side, also shot Harris. Just here Sidney noticed that Farris and Clabe Gilbert had their weapons drawn on him, and Farris fired, striking Sid in the stomach. Sidney then shot at each of them, and supposes that he wounded Farris in the leg, and he says perhaps it was his shot at Clabe that killed him, and in this way he insists that the fatal wound in Clabe's body entered in front and came out at the back. He admits that Farris, McIntosh, and Grover all ran away at this time, but says they were trying to take shelter on the hillside across the creek, and with a knowledge of the threats that had been communicated to him a few days before, and his brother's

assassination a year before, and an assassin's attempt on his own life, he felt like he was still in danger, even in greater danger, for these parties, as he saw it, were merely getting behind rocks or timber on the hillside across the creek so that they could pick him out and kill him and his brothers from such points of vantage. He admits going across the creek at the point where Mary says, with a shotgun, and firing two shots up into the woods in the direction where he saw some smoke rising from a couple of shots which had been fired off the cliff at him. In his own language he says:

"I went across this creek here, just upon the bottom. I guess we were three or four steps in the bottom. When I got over there, I was about to give out, somebody shot two shots off the bluff at me. I thought these fellows was running over there for protection and I went across there. I shot two shots in the direction of the smoke, and I came back here and laid down on the ground. I thought i was killed and laid down there."

Sid says in the first encounter Farris shot five times at him, and that Grover shot once at him and missed him, and that when Farris and Mary got in the bar of the creek, he shot at Farris, and that Farris was loading and shooting back at him. He did not know how many times. The witnesses who saw Farris' pistol as soon as his body was reached, say it was a 38 five shot Smith and Wesson; that it had one empty chamber, one blank shell and three loads. The Commonwealth contends, and Mary swears, that Farris never fired but the one shot, and that was when he hit Sidney in the stomach. There is other evidence to show that his pistol was examined in the presence of several witnesses by Bud Gabbard on Farris' way to the voting place that morning, and it then had one empty chamber and four loads, and that Farris had no other cartridges on his person. Bud Gabbard's presence, and his examination of this pistol is a part of the conspiracy charged by the Commonwealth. It is proved that this Bud Gabbard, one of those indicted, and a brother of Sid's, went up to Clabe Gilbert's the evening before the election, and the next morning traveled with Clabe, Farris and his wife eight or ten miles down to the voting place. There were also in the party Squire and Bud McIntosh, two men named Barger, and two named Gay, Noah Campbell, and possibly others. On the way down that morning Bud Gabbard wanted to buy Farris'

pistol and asked to see it. Farris handed it to Bud, and Bud examined it, finding only four cartridges, and Farris told him that was all he had. Bud wanted to shoot it off, but Farris would not let him. Before they got to the election grounds, Bud wanted to buy Clabe's pistol, and examined it. It had only two cartridges, and Clabe said that was all he had. Clabe did not sell it because he would not agree to Bud's proposal to take it until he got to the election grounds under a promise to pay for it then.

The Commonwealth proved numerous incriminating statements and acts of the several indicted persons, except Sid, made during the morning, evincing a determination to kill the Gilberts, and some of them made at times when the others were not present. This proof was admitted on the idea that a conspiracy was established, and hence the acts and statements of one were competent as against the others. The Gabbards denied these acts and statements, including those attributed to old man Gabbard and Sid, about following Farris, hunting him out, and killing him. Bud and Sid denied the striking and mistreating of Mary Gilbert in any way; in fact, Sid says he never went into the bushes on the other side of the creek; that he did fire two shots up at a place where he saw smoke, and where he thought somebody, perhaps Farris, was shooting at him, but did not know that he had hit him, if in fact he did. He says, and the Gabbards corroborate him in this, that by that time he was getting so sick that he had to lay down close to the creek, and that Mary was there with him, not knowing that her husband had been killed, and that she stayed there with him, his brothers, and father for half an hour sympathizing with them, and apologizing for the conduct of Farris, Clabe, and her brother Grover. Finally Sid himself said to Mary, that maybe Farris was killed, and suggested that she had better go up there on the hill and see about him. This was a half an hour after the shooting had ceased. The Commonwealth corroborates Mary, and attempts to destroy the effect of all this by showing by three or four men who had fled for safety to the top of the hill just across from this bar or ford, that while the shooting was going on, they heard Mary screaming and begging them not to kill Farris, and when the last shot was fired, they heard her scream, "You have killed him." To further break the effect of Mary's testimony

the defense introduces Dan and Sam Robinson, and William Gabbard, who came there that night and talked with her as she kept vigil over the remains of her deceased husband.

This William Gabbard is another brother, but not charged with having anything to do with the fight. He was at some other voting precinct in the county, electioneering for Harvey. Late in the evening he heard of the killing at Buffalo, and with a doctor, the two Robinsons, and some other men, went over there, and at various times during the night these several men plied Mary with innumerable questions as to what had happened, and all of their testimony was to the effect that she blamed her brother, Grover, for starting it, and that she was sympathizing with the Gabbards, and said that if her husband had minded her, and gone away when she asked him to, he would not have been killed. At other points in their testimony they admitted that she was having fainting spells and was highly nervous, and complaining of her shoulder and side hurting her. One of the Robinsons, on cross-examination by the Commonwealth, says that he asked Mary what was the matter with her shoulder, and she says, "Sid hit me with the gun," and I says, "How come him to hit you with the gun, Mary?" and she says, "I was trying to keep him from killing Farris."

We have already observed appellant's claim that no motive for a conspiracy was shown. We agree that the evidence does not afford any plausible explanation for the beginning of this sudden and awful tragedy. One cannot point out a single thing, and say this caused it. It may have been one or two quarts of whiskey which Grover or the Gilberts had there in fruit jars. The evidence shows that all of them, including some of the Gabbards, drank more or less of it, and Grover more than any of them. Farris was less under the influence of it than any of the Gilberts, if at all. The difficulty may have been precipitated by Grover, as the Gabbards contend, when he knocked off Budhead Baker's hat, and Gilbert Farris remonstrated with him. Grover certainly was a great big rowdy, and his conduct on the ground that morning, and before the beginning of the fight is anything but commendable. The theory of the Gabbards is, and it is not unreasonable, that he is just the sort of a fellow to

get his associates into trouble, and then run away; but there is another side to it, and that is the strong impression one gains from reading the record that the Gabbards were not only prepared for and expecting a difficulty, but inviting and provoking this one.

This leads us to a further consideration of the evidence tending to show a prior conspiracy between all these men charged in the indictment, including the appellant, and to understand the effect of it, it is well to bear in mind some familiar rules of law applicable to such cases. It is well stated in Am. & En. Ency. of Law, Vol. 6, page 864:

"It is not necessary, in order that the fact of a conspiracy may be established, that it should be proved by evidence of an express agreement or compact between the alleged conspirators or by direct evidence of any agreement or compact. A conspiracy may be proved inferentially or by circumstantial evidence. Conspiracies from their very nature, it has been said, are usually entered into in secret and are consequently difficult to be reached by positive testimony, which renders it peculiarly necessary and proper to permit them to be inferred from circumstances. And the existence of a conspiracy is a question of fact to be determined by the jury, who should decide from all the evidence whether there is such a combined intent and confederation as constitutes the offense."

The same observation is made in the case of Daniel v. Commonwealth, 154 Ky., 601, *supra,* as follows:

"A conspiracy is always difficult to prove. The fact that those contemplating the commission of a crime have banded themselves together for the purpose of committing it is rarely established by direct positive evidence of such crime, but in a majority of cases, must be shown by circumstances which, when put together into a composite whole, evidence such a purpose on their part."

To the same effect is Gambrell v. Commonwealth, 130 Ky., 519:

"A conspiracy is almost necessarily established by the welding into one chain of a number of links, each in itself inconclusive and insufficient to prove the conspiracy, but, when connected and examined as a whole, sufficient to show it."

So that the question presented by appellant is whether the facts already related, in connection with the circum-

stances which we are yet to consider will, when taken altogether, evidence a conspiracy on their part. In the first place it should be remembered that none of the Gabbards charged with the killing, and none of those killed, resided at or near this voting place. Perhaps the closest was Sid Gabbard, the appellant, and he lived 1 or 2 miles down the creek. William Gabbard, another brother, lived there at the voting place, and at one time kept a store. The store room is still there, but at that time was vacant. William Gabbard was away that day, his family was gone, and his house locked up. The proof shows that all the Gabbards charged with the killing went to the election that morning armed with guns and pistols. One of them, Bud Gabbard, was an election officer. He had a pistol in his saddle pockets in the election room. There was a gun hidden under the house where they voted, another hid by Riley Gabbard some yards back of it, and a number of weapons were hid away in William Gabbard's residence which was locked up, and his father and brothers seemed to know just where they were. One of them broke into the house, lifted up the mattress or quilts, and found a rifle hidden in the bed, and it was soon brought into use.

Riley Gabbard, one of the defendants, and who was introduced as a witness in behalf of appellant, after testifying to his own good character, said that he had never had any trouble with anybody, and that his feelings toward Grover Gabbard and all of the deceased were especially good, and testifying in chief, he was asked what he did with his gun when he took it to the election that morning, and he replied:

"Well, sir, I took it there that morning to the election and looked out the hills and looked around the election grounds to see if there was anybody way-laying and seed there wasn't and I took it pretty close to the election grounds and hid it and went on down below the election ground and let Sid Gabbard know there wasn't nobody way-laying, so he could come on up to the ground and I went down below the election ground and met him and told him."

On cross-examination Riley admits that he did considerable traveling the day before the election. He went up to old man Elisha Gabbard's, and then down the creek to Lige Gabbard's, and then over to see Sid, and perhaps to see Dan. When he got back home he had a Win-

chester shotgun which he had gotten from Sid. He kept it all night, and this is the gun he took to the election with him the next morning to see if somebody was out in the hills way-laying, after which he hid it a short distance from the voting place. Appellant's attorney asked him at whose instance he did this, and he replied, "Sid Gabbard's and those other boys." Asked why he thought somebdoy was out way-laying, he said Lou and Sam Abner told him that they saw two men, unknown to them, with guns some two days before the election in the hills a half or a quarter of a mile away.

Appellant says that he did not stay at home the night before the election, that he was afraid—afraid of being way-laid and killed, for he had been informed that three men were seen with guns in that neighborhood. He had no information as to who they were, or their motive.

Sid does not dispute or explain what he said to Riley about bringing his gun there, but it is clear from his own testimony that he and his brothers were prepared for trouble. They undertake to explain their fear by re- lating the story about the two or three armed men seen in the woods or hills. Just why they expected a crisis on election day is not clear. The six men who had killed his brother were in the State penitentiary. He may have be- lieved still others were guilty and at large, but there is no hint anywhere that he suspected the Gilberts had any hand in it. It is almost impossible to understand, if there was a conspiracy against the Gilberts, the animus for it. All of them stoutly maintain that they had never had any trouble or dispute with the Gilberts, or with Grover Gabbard. However, they relate some circum- stances which leave us in doubt as to just what they mean when they say they have never had any trouble, at least, how they measure trouble. For instance: Dan Gabbard says that he never had any trouble with Grover, nor had any fight with him, but in answer to the next question he says that two or three years ago Grover was drinking, and hit Bill Gabbard in the face with his fist, and that he (Dan) hit Grover over the head with a chair, and put him out of the house. To them perhaps a difficulty or trouble, to amount to anything, must be like that in which a brother was assassinated, or in which the Gilberts were killed this day.

If the thorough state of preparedness in which the Gabbards found themselves that morning, and what Sid

said to Riley about his Winchester gun, and having it at the election place, together with the initial steps he took in the fight, are not sufficient to connect Sid with the conspiracy and authorize a submission of the question to the jury, we certainly find ample warrant for it when we consider that part of the tragedy, after Farris had abandoned the fight and gone with his wife to the ford of the creek. Sid and his brothers followed him up, entered the woods, and shot him in the back. If the testimony of the Commonwealth is to be believed, the old man and all the boys named in the indictment were heart and soul engaged in a conspiracy to run Farris Gilbert down and kill him before he could get away. Farris Gilbert, if he ever willingly got into the fight, had abandoned it, and ran into the hills for safety. The Gabbards were not there with a home to defend, nor were they called upon to pursue him. Encouraged by old man Elisha Gabbard, who was urging them to run him down, Sid said to his brothers as he sent them in one direction to look for him, that they must not let him get away. Sid in making his search found him, and killed him. The reason the other brothers did not kill him was because Farris had not gone that way.

We are of opinion that the court was abundantly justified in submitting the question of Sid Gabbard's part in the conspiracy.

At the conclusion of appellant's testimony, the Commonwealth introduced a dozen witnesses to impeach his reputation for morality. Appellant complains that this inquiry should have been confined to a time prior to the tragedy. Four of the witnesses gave their character testimony without objection from appellant, but when the fourth left the stand, appellant moved to exclude all of it, and took exception to the court's refusal. As the other eight Commonwealth witnesses testified, appellant objected at the proper time and saved his exceptions.

An attempt to impeach a witness for bad moral character is for the sole purpose of affecting his credibility, and this rule applies also to the accused, as a witness, unless from the very nature of the offense his moral character is involved, or may be brought in issue by it. In the case of an accused person who testifies in his own behalf, and that is what we have here, it would be manifestly unfair to have witnesses testify to their opinion of his reputation from what they had heard his neighbors

and acquaintances say of him since the offense was committed, because too frequently the circumstances of the offense adversely affect the standing and reputation of the accused. The law wisely confines evidence of this character to a time prior to the commission of the offense, but we do not understand that this rule has been violated here. In the first place it will be noticed that a comparatively short interval elapsed between the August primary and the trial in January. The question propounded by the Commonwealth did not relate to any particular time. It was a general question as to whether the witnesses were acquainted with the reputation for morality, of the person named, among his neighbors and acquaintances. We do not believe the appellant is accurate when he says these questions were directed to a time subsequent to the primary. It can be as truly said they related to a time prior to it. On cross-examination it was shown by these witnesses that the information upon which they based their opinion was gained prior to a time when the offense was committed, although two or three of them said their opinion had been affected by some things they had heard since the tragedy. The defendant introduced an equal number of witnesses to sustain his character, and the form of questions as to both time and reputation on direct and cross-examination was the same by both the Commonwealth and appellant. It all related to reputation for morality, and not directly to truth and veracity. We see no just ground of complaint on this proposition.

Appellant complains that the court refused him an opportunity to impeach the Commonwealth's impeaching witnesses. He offered to prove the bad moral character of three of the Commonwealth's witnesses who had testified as to the bad moral character of appellant and his brothers. As to Jess and Booner Dean, this character of evidence was clearly incompetent. These two witnesses had testified in chief for the Commonwealth. The appellant had introduced his witnesses, and he made no attempt to impeach the Deans or any other witness. When he came to introduce witnesses in sur-rebuttal, it was clearly too late to attempt to impeach the Commonwealth's witnesses who had testified in chief. If appellant wanted to do this, he should have done it when he was introducing his witnesses in chief.

As to the other character witness, his name is Henry Couch. He does not appear in the case until the Com-

monwealth introduces him to impeach the character of the Gabbards. Appellant offered three witnesses to testify that this Henry Couch himself bears a bad moral reputation. The court rejected the evidence, and appellant says the ruling was on the idea that if that sort of evidence be competent, the trial would be interminable. If this was the reason that actuated the court, we must confess there is a great deal of force in it.

From the conflicting character of the evidence and the positive and ready manner in which the witnesses detailed it, there is no doubt appellant could have proven by any number of witnesses that all the witnesses of the Commonwealth, as to character, had bad reputations; in fact, appellant says the reason he did not offer to impeach the character of others than Henry Couch, was because the court refused it in his case. The Commonwealth had free access to the same sort of witnesses, and had the court permitted it they would have put appellant's sustaining witnesses in as bad a plight.

If appellant correctly states the court's reason for this ruling, it is fair to the court also to say that there is good authority in support of it. We quote from 2 Wigmore on Evidence, section 894:

"No question arises here except as to the use of character evidence. When B is brought forward to impeach A, and C to impeach B, it is obvious that not only might there be no end to this process, but the real issues of the case might be wholly lost sight of in a mass of testimony amounting to not much more than mutual vilification. The general rule as to limiting the number of witnesses upon a given point (post, 1907) does not in strictness apply. Three courses are open to pursue: First, to exclude absolutely the impeachment of the character of an impeaching witness; seconaly, to admit the impeachment of an impeaching witness, but no more; thirdly, to admit it only to such an extent as the discretion of the trial court deems best. The first two of these rules are represented in different jurisdictions. In such a case, however, any mere rule of thumb is undesirable; the preferable rule is the third."

See also sections 920 and 922, same work.

This court, however, in the case of Dunn v. Commonwealth, 119 Ky., 461, seems to have followed a contrary rule to that stated in Wigmore. It is there said:

"When a witness is introduced to impeach another witness by evidence that his general moral character is

bad, the opposite party may, in reply, attack the general character of the impeaching witness.''

However, it is not necessary to reopen the question, or to further discuss or consider the rule, for, to apply either, we cannot see that appellant was prejudiced by the court's refusal to permit evidence impeaching the moral character of one witness, when that witness only testified as to the moral character of the accused and some of his witnesses. If there were other witnesses of this nature who could have been impeached, appellant did not offer them, nor did he make any avowals with reference to them. This character of evidence is going very far away from the real issues, and if it was error, it was so small and inconsequential as not to give ground for serious complaint.

The next ground urged for reversal grows out of the following circumstances. It seems that Mary Gilbert and her father, Mike Gabbard, had several conversations with the witness Riley Gabbard, who was jointly accused with appellant, while Riley was confined in jail at Booneville. Appellant says that in these conversations they promised immunity to Riley if he would swear against Bill Gabbard and say ''that Bill Gabbard got him to take that gun down there for the purpose of killing Farris Gilbert and Grover Gabbard.'' The Commonwealth says that Mary and Mike Gabbard did have talks with Riley at the jail, but they promised him no immunity, and made no effort to have him implicate Bill Gabbard, or any one, in the trouble. It should be remembered here that Bill Gabbard was the absent brother who was working for Harvey at some other precinct. He did not get to Buffalo where the killing occurred until that night, and he was not indicted. The Commonwealth says the following was the effect of the conversation, viz.: ''Riley said that Sid Gabbard had told him to go up the creek the day before the trouble and take his Winchester gun and take all the other guns and take them to the election ground and hide them before daylight on the morning of the election, and that Sid Gabbard, Gilbert Harris and Bud Gabbard were going to kill Farris Gilbert and Grover Gabbard that day.'' It will be observed that appellant's version of the conversations related to Bill Gabbard, a party not concerned, or accused of having any part in the tragedy, and for that reason it tended to raise a collateral issue, while according to the Commonwealth, the conversations involved Sid Gabbard the accused, so

that, if true, Riley Gabbard could have properly testified concerning the alleged facts.

With the conversations admitted, although on these two widely different versions, then it remains for us to consider the methods by which they were offered in evidence, and whether there was error in the court's ruling with reference to them.

Mary Gilbert and Mike Gabbard testified in chief for the Commonwealth, and no question was asked of them about the conservations with Riley Gabbard on direct or cross-examination. Had it been the intention of the defendant to contradict these witnesses by Riley Gabbard, and had the conversations, as understood by Riley been related to a material issue, the defendant should have then and there laid the ground for their contradiction by asking them if they had made such statements, giving the time and place. This was not done.

Riley Gabbard was later on introduced as a witness in behalf of appellant, and appellant's attorney asked him if Mary Gilbert and her father, Mike Gabbard, did not tell him at the jail they would have him turned loose if he would swear that Bill Gabbard got him to take the guns down there. The Commonwealth made no objection to this, in fact asked the court to let the witness answer, but the court of its own motion ruled that the question was incompetent, and said: "The court has a right to interpose an objection to incompetent evidence." This ruling of the court was on the idea that defendant in interrogating Mary Gilbert and her father, Mike Gabbard, had laid no ground for contradicting them by Riley, and that testimony with reference to William Gabbard, who was not connected with the crime, was a collateral matter. It should be remembered that this was the first time Riley Gabbard came on the stand as a witness, and when the Commonwealth began to cross-examine him, he was then asked, if at the jail at the time spoken of, he had not said to Mary Gilbert and her father, Mike Gabbard, that Sid had gotten him to take his gun down there, and gather up all the other guns, and that they were going to kill Farris Gilbert and Grover Gabbard, etc. Defendant did not object to this question, and the witness denied that he had made any such statement.

On re-direct examination appellant's attorney asked him this question: "I will ask you if Mary and Mike did not ask you to swear what Mr. Eversole asked you?" To this the witness answered yes, and the Commonwealth

made no objection to the question or answer. The matter which Mr. Eversole asked of the witness goes back to the question in his direct examination, already referred to and which the court refused to let the witness answer, and was to the effect that Mary and Mike Gabbard had tried to get him to swear that it was through Bill Gabbard's instrumentality, and for the purpose of killing Grover and Farris that he had taken the guns there that morning. Appellant's attorney then asked witness the following further questions, and to none of which did the Commonwealth offer any objection:

"Q. You told them you would not do it because it wasn't the truth. A. Certainly, I told them I couldn't afford to swear a lie against these fellows nor nobody else. Q. Didn't they tell you that if you would swear that, they would not prosecute you and turn you out? A. Yes."

From these last questions of appellant's attorney it will be seen that appellant got the benefit of Riley's testimony as to what occurred at the jail, although the court rejected it in the first instance; but in our opinion the first ruling of the court was correct. Mary Gilbert and Mike Gabbard were not on trial, and they were not accused of anything. They were mere witnesses introduced in behalf of the Commonwealth. The appellant did not ask them while they were on the stand what they had said to Riley Gabbard, or whether they had said anything to him at any time or place. Instead of doing so, he put Riley Gabbard on the stand and undertook to prove by him statements which the two witnesses had made at another time, and which they had never denied, and concerning William Gabbard who was not connected with the crime.

Section 598 of the Civil Code requires that before one can introduce evidence of this sort to contradict a witness, the witness sought to be contradicted must first "be inquired of concerning it, with the circumstances of time, place and persons present, as correctly as the examining party can present them." The method which appellant chose for the introduction of evidence to contradict these two witnesses is in such plain violation of this provision of the Code, that it is only necessary to refer to and quote from it to show that the court ruled properly in rejecting it, and that appellant has no ground for complaint.

We have already shown how appellant got before the jury his version of what these two witnesses did say to Riley Gabbard, notwithstanding the first ruling of the court. The Commonwealth pursued the proper course in getting before the jury the version which Mary and Mike gave of the conversation. When the defendant put Riley Gabbard on the stand, the Commonwealth interrogated him as to the conversation naming the time and place; and when he denied it, it then became competent for the Commonwealth to introduce Mary and Mike to contradict him by proving the conversation. Of course, proof of this conversation by the Commonwealth can only be heard to affect the credibility of Riley Gabbard, and we find that the court immediately admonished the jury as follows:

"Now, gentlemen of the jury, you are only to take and receive this in so far as you may believe it contradicts or impeaches the defendant, Riley Gabbard, but you will not take it for any evidence against Sid Gabbard. You will take and receive this in so far as you may believe it contradicts or impeaches the witness Riley Gabbard, if it does so do, but you will not consider it as substantive evidence against the defendant for any purpose."

Appellant's final complaint is that the court excluded from the consideration of the jury certain testimony given by appellant's witness Dave Reed. This witness was asked by appellant's attorney whether he had seen "Grover Gabbard, Clabe Gilbert, Squire McIntosh and Farris Gilbert, or any of them, down below the election ground some time before the difficulty?" The witness answered that "there was a whole crowd of them down there just before I left there, seemed to be drinking. They had a can of something in their hands, Farris and them and Rob Baker (Budhead), and something was said about the election, and they said they was going to play hell or tear up the election or something."

On further inquiry it developed that he did not know how many were in the crowd or who made the remark about tearing up the election, etc. On request of the Commonwealth, and over appellant's objection, the court then excluded the testimony referred to.

It is sufficient answer to this complaint to say that the evidence was uncertain and without definite reference to the Gilberts. or any others involved in the difficulty.

Having noticed all the objections which appellant raises on this appeal, and perceiving no prejudicial error of the court, or any occurring in the trial of the case, at least none whereby appellant's substantial rights have been prejudiced, we are of opinion that the judgment should be affirmed, and it is so ordered.